# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA
### FOURTH DIVISION

| | |
|---|---|
| James Richard Huntsman, | Case No. 19 cv 2 PAM / HB |
| Plaintiff, | Judge: _____ |
| vs. | |
| | **COMPLAINT** |
| 3M Company, a Delaware corporation, formerly known as the Minnesota Mining and Manufacturing Company, now also commonly known as 3M; 3M Company Employee Retirement Income Plan, formerly the Employee Retirement Income Plan of the Minnesota Mining and Manufacturing Company; 3M Company Portfolio I Pension Plan; 3M Qualified Order Team; Michael Anderson, as Plan Administrator for the 3M Company Employee Retirement Income Plan and for the 3M Company Portfolio I Pension Plan; Zenith Annette Huntsman; Bradley C. Eggen, Esq.; and The Law Office of Brad C. Eggen, | |
| Defendants. | |

Plaintiff, James Richard Huntsman, for his Complaint, states, alleges, and claims as follows:

## PARTIES

1.    Plaintiff James Richard Huntsman resides at 2570 Moundsview Drive, Mounds View, MN 55112-4110, Ramsey County, Minnesota, telephone number (763) 784-2656.  Plaintiff is a plan participant ("Participant") in the 3M Company Employee Retirement Income Plan, and in its former Employee Retirement Income Plan of Minnesota

SCANNED
JAN 02 2019
U.S. DISTRICT COURT MPLS

Mining and Manufacturing Company, both sponsored by Plaintiff's previous employer, 3M Company.

2.    3M Company is a Delaware corporation whose corporate headquarters are located at 3M Center, 2501 Hudson Rd., Maplewood, MN, 55144-1000, Washington County, Minnesota, telephone (651) 733-1110, and does business in Minnesota.    3M Company was formerly known as the Minnesota Mining and Manufacturing Company so that unless distinguished otherwise, hereinafter "3M Company" shall include the Minnesota Mining and Manufacturing Company.

3.    The 3M Company Employee Retirement Income Plan ("3M ERIP"), formerly the Employee Retirement Income Plan of Minnesota Mining and Manufacturing Company, is a defined-benefit pension plan sponsored by 3M Company under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et. seq., as amended ("ERISA") so that unless distinguished otherwise, hereinafter "3M ERIP" shall include the Employee Retirement Income Plan of Minnesota Mining and Manufacturing Company. The address of 3M ERIP is 3M Company, 3M Center, Bldg. 224-2W-15, Maplewood, MN, 55144-1000, Washington County, Minnesota.

4.    Upon information and belief, Plaintiff is a plan participant in the 3M Portfolio I Pension Plan, also sponsored by his previous employer, 3M Company, which is believed to be a type of pension plan under the 3M ERIP and a defined-benefit pension plan under ERISA.  The address of the 3M Portfolio I Pension Plan is 3M Company, 3M Center, Bldg. 224-2W-15, Maplewood, MN, 55144-1000, Washington County, Minnesota. Unless otherwise distinguished, hereinafter "3M ERIP" shall include the 3M Portfolio I

2

Pension Plan.

5.    Upon information and belief, Michael Anderson is the Plan Administrator for the 3M ERIP and is addressed at 3M Company, 3M Center, Bldg. 224-2W-15, Maplewood, MN, 55144-1000, Washington County, Minnesota.    Unless otherwise clarified or distinguished, hereinafter "Plan Administrator" shall mean the Plan Administrator for the 3M ERIP.

6.    The 3M Qualified Order Team is believed to be an administrative agent of the 3M ERIP and the Plan Administrator, and is authorized by the 3M ERIP and 3M Company to act on behalf of the Plan Administrator for the 3M ERIP.  The address of the 3M Qualified Order Team is P.O. Box 1433, Lincolnshire, IL, 60069-1433, telephone (888) 611-5500.  Unless otherwise clarified or distinguished, hereinafter "3M ERIP" shall include the 3M Qualified Order Team.

7.    Defendant Zenith Annette Huntsman ("Defendant Huntsman") is an alternate payee ("Alternate Payee") of Plaintiff's 3M ERIP and resides at 190 Sixth Street South, Bayport, MN 55003-1522, Washington County, Minnesota.

8.    Defendant Huntsman has received, and continues to receive, payments from Plaintiff's 3M ERIP payments by the Plan Administrator under the provisions of several ERISA qualified domestic relations orders ("QDROs") issued by Minnesota state courts. Defendant Huntsman's rights to receive said payments are disputed herein and the subject of this action.

9.    Defendant Bradley C. Eggen, Esq. ("Defendant Eggen"), Minnesota attorney license number 25,999, was, and is believed to be currently, the attorney for Defendant

3

Huntsman, and upon information and belief, is a Principal in, and the sole proprietor of, The Law Office of Brad C. Eggen, located at 330 Second Avenue South, Suite 350, Minneapolis, MN 55401-2212, Hennepin County, Minnesota, telephone (612) 630-3227.

10.     Defendant The Law Office of Brad C. Eggen ("Defendant Eggen Law Office"), is believed to be a sole proprietorship law firm and is located at 330 Second Avenue South, Suite 350, Minneapolis, MN 55401-2212, Hennepin County, Minnesota, telephone (612) 630-3230.

11.     Unless otherwise clarified or distinguished, hereinafter "3M" shall collectively refer to and include Defendants 3M Company, Minnesota Mining and Manufacturing Company, 3M ERIP, 3M Qualified Order Team, Michael Anderson, and the Plan Administrator for the 3M ERIP.

## JURISDICTION

12.     This action arises under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, et. seq., as amended ("ERISA"), and principles of federal common law developed thereunder. Wherefore, this Court has jurisdiction of this action under ERISA pursuant to 29 U.S.C. § 1132(e)(1), and as a federal question pursuant to 28 U.S.C. § 1331.

13.     More particularly but not exclusively, this action involves several QDROs issued by Minnesota state courts involving Plaintiff, Defendant Huntsman, and 3M, and determined to be valid QDROs under ERISA by 3M, and arises under 29 U.S.C. §§ 1056(d)(1),     1056(d)(3)(A),     1056(d)(3)(B),     1056(d)(3)(D),     1056(d)(3)(G), 1056(d)(3)(H)(i), 1056(d)(3)(K).   Wherefore, this Court has jurisdiction of this action

under ERISA pursuant to 29 U.S.C. § 1132(e)(1), and as a federal question pursuant to 28 U.S.C. § 1331.

14.    Additionally, but not exclusively, this action arises under 29 U.S.C. §§ 1056(d)(1), 1056(d)(3)(A), 1056(d)(3)(B), 1056(d)(3)(C), 1056(d)(3)(D), which involve Minnesota domestic relations law, including, but not limited to, Minnesota domestic relations orders ("DROs"), for which this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

15.    This action involves other federal questions that arise under 15 U.S.C. §§ 1672, 1673(b)(2)(A), 1673(c), 1675, and 1677(1), regarding maximum limits on income withholding or garnishment, for which this Court has jurisdiction pursuant to 28 U.S.C. § 1331.

16.    This action also arises under and involves 28 U.S.C. § 2201(a), regarding declaratory judgments, for which this Court has jurisdiction pursuant to 28 U.S.C. § 1331.

17.    This action also arises under and involves Minnesota Statutes ("Minn. Stat."), § 518.58, subds. 1, 2, 4(a) (2000), (2018), regarding the division of marital and nonmarital property, for which this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

18.    This action also arises under and involves Minn. Stat., § 518.582, subd. 4 (2000), (2018), regarding the stipulation of marital property rights, for which this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

19.    This action also arises under and involves Minn. Stat., §§ 518.003, subds. 3b, 6, 7 (2018), 518.54, subds. 5, 10, 12 (2000), regarding marital and nonmarital property,

pension plan benefits, and private pension plans, for which this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

20.    This action also arises under and involves Minn. Stat., §§ 518.64, subd. 2(e) (2000), 518A.39, subd. 2(f) (2018), regarding the finality of property divisions, for which this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

21.    This action also arises under and involves Minn. Stat., §§ 518A.26, subd. 1, 518A.29(a) (2018), regarding the determination of gross income, for which this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

22.    This action also arises under and involves Minn. Stat., § 518A.53, subd. 9(a), which incorporates 15 U.S.C. § 1673(b), and 571.922(a)(1), which set forth the maximum amount of income that may be withheld or garnished, for which this Court has jurisdiction pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

23.    This action also arises under and involves Minn. Stat., § 549.09, subds. 1(b), 1(c)(1)(i), 2, 3, regarding interest on awards, and Minn. R. Civ. P. 52.02, for which this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

## **VENUE**

24.    Venue is proper in this district under 29 U.S.C. § 1132(e)(2) because this action involves employee benefit plans, namely, the 3M ERIP and the 3M Portfolio I Pension Plan, which are administered in this district, and the sponsor of the 3M ERIP and the 3M Portfolio I Pension Plan, 3M, does business in this district.

25.    Venue is proper in this district because Defendant Huntsman resides in this

6

district.

26.    Venue is proper in this district because Defendants Eggen and Eggen Law Office do business and are found in this district.

27.    Venue is proper in this district because the facts alleged below occurred primarily in Minnesota.

## STATEMENT OF THE CLAIMS AND ALLEGATIONS

28.    All Exhibits included herewith are true copies of the document(s) they represent and incorporated herein in their entirety as if fully set forth herein in their entirety.

29.    Plaintiff was a continuous, full-time employee for 3M from October 1973 to May 2002, during which time, Plaintiff became a plan Participant in the 3M ERIP.

30.    Plaintiff was formerly married to Defendant Huntsman.  Their marriage was dissolved by a judgment and decree on January 14, 2000 ("Judgment and Decree"; see Exhibit 1 included herewith, which excludes irrelevant exhibits and appendices thereto), in a civil proceeding in the State of Minnesota, 10th Judicial District, County of Washington, Family Court Division, City of Stillwater, Case number 82-F7-98-002231, wherein the Plaintiff/Participant herein is the Petitioner therein, and Defendant Huntsman/Alternate Payee herein is the Respondent therein.

31.    As part of their marital dissolution property settlement, Plaintiff and Defendant Huntsman agreed that Plaintiff's 3M ERIP's benefits would be divided between them by a QDRO.  The Judgment and Decree, page 28, Conclusion of Law 22 (see Exhibit 1), divided Plaintiff's 3M ERIP pension rights and interests with Defendant Huntsman *as a property settlement*:

"3M Pension and Retirement Interest - Each party shall be awarded one-half (1/2) of [Participant's] *present* 3M Pension and Retirement Plan. *Each party shall receive their interest pursuant to a Qualified Domestic Relations Order*, which shall be prepared by [Participant's] attorney immediately upon entry of the Judgment and Decree herein.

Each party shall have a separate ownership interest in his or her share of the retirement benefits, together with the separate responsibility for any tax liability and attributed hereto. It is intended that the tax consequences of the receipt of these payments be born according to the proportionate share of the total payments received by each party. *These payments shall be made in all events, the provisions of the Judgment and Decree shall not be modified by any change of circumstances of either party.*

The Court shall retain jurisdiction *to effect the division of the retirement benefits* and allocation of tax consequences *in accordance herewith. The division of retirement benefits is a property settlement.*" (italics added).

32.    The Judgment and Decree, pages 30-31, Conclusion of Law 37 (see Exhibit 1 included herewith), declared the property division of Plaintiff's 3M ERIP benefits in the forthcoming QDRO, which is incorporated into the Judgment and Decree, to be "a *full, final and complete property settlement* between the parties.":

"Release - Subject to the foregoing and subject to full compliance therewith, each of the parties does in all respects, manners and things release and fully discharge the other from any liability, claims or obligations of any kind or character, whether arising out of the marriage relationship or otherwise, and *the foregoing shall be deemed to constitute a full, final and complete property settlement between the parties.*" (italics added).

33.    On November 28, 2000, pursuant to the aforesaid Conclusion of Law 22 in paragraph 31, Plaintiff's attorney submitted his proposed QDRO to the state court and to Defendant Huntsman's attorney for their review (see Exhibit 2 included herewith), and Defendant Huntsman's attorney made no objections or proposed no amendments to the Plaintiff's proposed QDRO in Exhibit 2, pages 3 to 7 therein.

34.     As part of the divorce proceeding, the state court issued the Plaintiff's proposed QDRO as a DRO, signed on December 12, 2000, but filed on February 14, 2001 (see Exhibit 3 included herewith), which divided and irrevocably assigned to Defendant Huntsman 50% of Plaintiff's 3M ERIP benefits accrued as of April 2, 1999, the "Date of Division", and irrevocably divested Defendant Huntsman of all her rights in or to the unassigned pension benefits earned by the Plaintiff under the 3M ERIP *as of* April 2, 1999, and also irrevocably divested Defendant Huntsman of all her rights in or to any pension benefits earned by the Plaintiff under the 3M ERIP *after* April 2, 1999.  See paragraph 37 below.

35.     On November 20, 2001, the Plan Administrator initially determined the February 14, 2001 DRO to be a QDRO under ERISA ("2001 QDRO").  See Exhibit 4 included herewith.

36.     Neither Plaintiff nor Defendant Huntsman disputed or appealed the 2001 QDRO to the Plan Administrator or to a court of competent jurisdiction.  Therefore, the 2001 QDRO became final, controlling, and non-modifiable.  See Judgment and Decree, Conclusion of Law 37, paragraph 32 above.

37.     The 2001 QDRO (Exhibit 3), on page 2 therein, expressly provides, in relevant part:

> **"AMOUNT:**
>
> 1. **Percentage of Accrued Benefit With/Without Early Retirement Subsidies:**  Fifty percent (50%) of the Participants [*sic*] accrued benefit under the Plan as of April 2, 1999, the Date of Division, shall be and is irrevocably assigned to the Alternate Payee. *The Alternate Payee shall have no rights in or to the portion of the Participant's accrued benefit under the*

*Plan not assigned by this Order, or to any benefits earned by the Participant after the Date of Division.* However, if the Participant retires prior to his normal retirement date and begins receiving subsidized early retirement pension benefits from the Plan, the amount of the monthly benefit payments to the Alternate Payee will not be increased by a portion of the early retirement subsidies otherwise payable to the Participant." (bold in original; italics added).

38.   Under Minnesota domestic relations law, "Pension rights are also described as 'rights in the form of *future pension plan payments*.' Minn. Stat. § 518.58, subd. 4(a) (emphasis added)." *Lee v. Lee*, 775 N.W.2d 631, 638 (Minn. 2009).

39.   The language in the AMOUNT section of the 2001 QDRO in paragraph 37 is unambiguous and must be read and construed "according to its plain meaning:"

> "'**Interpretation of court orders presents questions of law' and '[a]s a general rule, when the language is unambiguous, it shall be construed according to its plain meaning.'** (citations omitted). Minch attached the Minnesota district court's order to his complaint, and we therefore consider the order a part of Minch's complaint. *See* Fed. R. Civ. P. 10(c) ('A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.')." *Minch Family LLLP v. Buffalo-Red River Watershed Dist.*, 628 F.3d 960, 967 (8th Cir. 2010).

40.   *No*, as in "no rights" in the 2001 QDRO, is defined as "*adj.* **1.** Not any; not one; not a. **2.** Not at all." *The American Heritage Dictionary of the English Language* 1195 (5th ed. 2011). Therefore, "no rights" excludes **all** Minnesota and federal constitutional rights, Minnesota and federal statutory rights, Minnesota and federal common law rights, and equitable rights. "It is also well established that, except as limited by public policy, a person may waive a statutory right." *Stephenson v. Martin*, 259 N.W.2d

467, 470 (Minn. 1977).

41. The language in the AMOUNT section of the 2001 QDRO in paragraph 37 above was taken virtually verbatim, excluding the language providing a formula for determining the AMOUNT, from the document entitled "3M Pension Plan QDRO", Second Edition, November, 1992, Part III, page 2, optional paragraph 1, said document provided by the Plan Administrator to Plaintiff's attorney, who used it to prepare the 2001 QDRO as described, cited, or alluded to in paragraphs 31 – 40 above.

42. Because the 2001 QDRO is valid, Defendant Huntsman consequently has no rights under 29 U.S.C. § 1056(d)(3)(A), (B)(i)(I), (B)(ii)(I), (B)(ii)(II), to make claims to any of Plaintiff's 3M ERIP pension benefits and payments, which Plaintiff's rights and payments thereunder are consequently **not excepted** from ERISA's anti-alienation or anti-assignment provisions of 29 U.S.C. § 1056(d)(1), and all of Plaintiff's 3M ERIP pension benefits, rights, and payments are protected under 29 U.S.C. § 1056(d)(1) from alienation of, assignment to, or claims by anyone, including Defendant Huntsman pursuant to any QDRO after the 2001 QDRO.

43. Minn. Stat., § 518.58, subd. 1 (2000) (2018) requires that "the court shall make a just and equitable division of the marital property of the parties."

44. Nonmarital property may be awarded at the discretion of the trial court. See *Crosby v. Crosby*, 587 N.W.2d 292 (Minn. App. 1998):

> "The trial court has broad discretion regarding the division of property in marriage dissolutions and will be reversed only for a clear abuse of discretion." *Id.* at 296. "*A trial court must make a just and equitable division of marital property.* Minn. Stat. § 518.58, subd. 1 (Supp. 1997). *An equitable division of marital property* is not necessarily an equal division."

*Id.* at 297.  "*Awards of non-marital property are left to the discretion of the trial court.  Doering v. Doering*, 385 N.W.2d 387, 391 (Minn. App. 1986)."  *Id.* (italics added).

45.     Plaintiff's 3M ERIP benefits and rights include his marital property and also his nonmarital (as to Defendant Huntsman) property, as defined by Minn. Stat., §§ 518.003, subd. 3b (2018), 518.54, subd. 5 (2000), wherein Plaintiff's nonmarital property is defined in clause (d) of the paragraph beginning, "Nonmarital property" …, in §§ 518.003, subd. 3b (2018) and 518.54, subd. 5 (2000).  Wherefore, under the 2001 QDRO, Plaintiff's 3M ERIP benefits and rights he earned and awarded him *as of* April 2, 1999, are his **marital** property, and Plaintiff's 3M ERIP benefits and rights he earned and awarded him *after* April 2, 1999, are solely his **nonmarital** (as to Defendant Huntsman) property.

46.     Plaintiff's benefits or rights in his 3M ERIP are defined by Minn. Stat., §§ 518.54, subds. 10, 12 (2000), 518.003, subds. 6, 7 (2018).

47.     Defendant Huntsman's 50% share of Plaintiff's **marital** 3M ERIP property, awarded by the 2001 QDRO as of April 2, 1999, the Date of Division, also the date of valuation, was valued at $460.89 per month by the Plan Administrator.  See Exhibit 3, page 2 therein, included herewith.  Defendant Huntsman elected to receive the $460.89 per month, beginning about January 2002.

48.     Because the 2001 QDRO declared and ruled that "[Defendant Huntsman] shall have no rights in or to the portion of the Participant's accrued benefit under the Plan not assigned by this Order, or to any benefits earned by the Participant after the Date of Division.", Plaintiff was awarded (1) 50% of Plaintiff's 3M ERIP benefits and rights that Plaintiff earned or acquired by or through his 3M ERIP not assigned to Defendant

Huntsman as of April 2, 1999, and (2) 100% of Plaintiff's 3M ERIP benefits and rights that Plaintiff earned or acquired by or through his 3M ERIP after April 2, 1999, which is solely Plaintiff's **nonmarital** property.

49.     The property division of Plaintiff's 3M ERIP pension plan benefits and rights between Plaintiff and Defendant Huntsman in the Judgment and Decree and the 2001 QDRO is a just and equitable property division under Minn. Stat., § 518.58, subd. 1, 2, 4(a) (2000).

50.     Because Plaintiff continued to be employed by 3M after April 2, 1999, his **nonmarital** 3M ERIP benefits could not be determined until termination of his 3M employment in May 2002.

51.     On April 2, 2002, Plaintiff was notified that his job at 3M was involuntarily terminated, and 3M offered Plaintiff, then age 55, multiple job severance options as consideration for a release of all future claims against 3M, said options including, inter alia, immediate retirement within 90 days (by about July 1, 2002), or a 5-year deferred retirement if elected within 45 days (by about May 17, 2002).

52.     Plaintiff's 3M ERIP as of his termination from 3M required that he be at least age 61 at retirement to receive full 3M ERIP retirement benefits, and if not 61, have his retirement benefits reduced by 5% for each prorated year he was under age 61 when he began receiving his 3M ERIP pension. Thus, if Plaintiff chose immediate, early retirement, his retirement benefits would be reduced by about 25%. Plaintiff chose the 5-year deferred retirement option, in which his retirement age and service time to 3M for 3M ERIP retirement benefit purposes continued to increase for five more years, thereby resulting in

less than a 1% reduction in his full 3M ERIP pension benefits at the end of the 5-year deferred retirement option, plus a 3% per year compounded increase in his 3M ERIP pension benefits during the deferred five years. Plaintiff's choosing the 5-year deferred retirement option resulted in Plaintiff's 3M ERIP pension payments to be **$3,259.09 gross per month as of June 1, 2007, which Plaintiff began receiving on June 1, 2007 and thereafter from the 3M ERIP.**

53.    Under 15 U.S.C. § 1672(a), (b), Plaintiff's disposable earnings from his $3,259.09 gross per month 3M ERIP pension are approximately $2,333.00 (see Plaintiff's August 17, 2018 Appeal of Defendant 3M's July 20, 2018 Initial Determination Notice, Exhibit 32 ("Plaintiff's Appeal"), included herewith, page 22 therein). Plaintiff's only other earnings are his Social Security benefits of $3,052.00 per month, and Plaintiff's disposable earnings under 15 U.S.C. § 1672(a), (b) from that $3,052.00 are approximately $2,397.60. Therefore, the Plaintiff's s aggregate disposable monthly earnings from both his 3M ERIP pension payments and Social Security is **approximately $4,730.60** (= $2,333.00 + $2,397.60) (see Plaintiff's Appeal, Exhibit 32, page 24 therein).

54.    On October 30, 2008, Defendant Huntsman sent a letter to 3M along with a copy of the September 19, 2005 amended spousal maintenance order in an attempt to collect from Plaintiff's 3M ERIP pension payments past-due spousal maintenance, allegedly owing to her as a consequence of Plaintiff's inability to pay spousal maintenance due to his involuntary job termination as a patent agent in August 2008 from the then Faegre & Benson law firm, Minneapolis, MN. Said 2005 amended spousal maintenance order did not address Plaintiff's 3M ERIP pension benefits or amend the 2001 QDRO.

14

55. Thereafter, by letter dated October 31, 2008 (Exhibit 5 included herewith), the Plan Administrator[1] gave Plaintiff and Defendant Huntsman notice that it was initiating procedures to restrict Plaintiff's monthly 3M pension payments even though the September 19, 2005 amended spousal maintenance order was not an ERISA QDRO.

56. Plaintiff responded to the Plan Administrator's October 31, 2008 letter by his letter dated November 3, 2008 (Exhibit 6 included herewith), challenging the Plan Administrator's right to restrict his 3M ERIP pension payments based on (1) the property division of Plaintiff's 3M ERIP in the parties' Judgment and Decree; (2) the property division of Plaintiff's 3M ERIP benefits and rights in the governing 2001 QDRO; (3) Minnesota domestic relations law prohibiting modification of final property awards; and (4) Minnesota domestic relations law prohibiting income from property awards from being used to pay spousal maintenance.

57. On December 1, 2008, the Plan Administrator began restricting and escrowing $1,207.00 per month from Plaintiff's monthly 3M ERIP pension payments for potential payment to Defendant Huntsman, as shown in Plaintiff's December 2008 pension accounting statement dated December 1, 2008 (see Exhibit 7[2], included herewith), provided to Plaintiff by the Plan Administrator, which shows Plaintiff's gross pension payment, "BASE Q", is "[$]2,052.09", which results from the said $1,207.00 escrow ($2,052.09 = $3,259.09 − $1,207.00). The Plan Administrator's monthly benefit

---

[1] As of that time, communications between the Plan Administrator and Plaintiff and Defendant Huntsman was done through its 3M Qualified Order Team.

[2] The $1,207.00 per month escrow from Plaintiff's monthly pension payment is shown also in Exhibit 31, provided to Plaintiff by the Plan Administrator.

statements sent to Plaintiff do not show any restrictions, escrows, payments, or distributions to Defendant Huntsman or anyone else, which can only be inferred from the amount that Plaintiff's BASE Q value is less than his full monthly payment of $3,259.09.

58.    Said escrow of $1,207.00 per month from Plaintiff's monthly pension payment occurred from December 1, 2008 through May 1, 2010, amounting to $21,726.00, as shown Exhibit 31, page 1, provided to Plaintiff by the Plan Administrator.

59.    On September 30, 2009, Defendant Huntsman, by and through her attorney Defendant Eggen, moved the state court to amend the 2001 QDRO by a supplemental QDRO. Plaintiff objected to Defendant Huntsman's request to amend the 2001 QDRO because, among other reasons, (1) the 2001 QDRO had become final and was not subject to modification, and (2) the payment of spousal maintenance from pension income awarded as property is not allowed under Minnesota domestic relations law. See *Lee v. Lee*, 775 N.W.2d 631, 639 (Minn. 2009) ("[P]ension benefits that have previously been awarded as marital property cannot also be considered income.").

60.    In consequence of Defendant Huntsman's September 30, 2009 motion in paragraph 59, the Plan Administrator's restriction and escrowing of Plaintiff's 3M pension increased from $1,207.00 per month to $1,562.27 per month as of June 1, 2010 and continued through September 1, 2010. See Exhibit 31, page 1.

61.    On August 24, 2010, the state district court issued and filed its domestic relations order entitled *Qualified Domestic Relations Order for the Employee Retirement Income Plan of Minnesota Mining and Manufacturing Company for the Purpose of Collection of Spousal Maintenance* ("2010 proposed QDRO"; see Exhibit 8 included

16

herewith).  The 2010 proposed QDRO stated that it supplemented and amended the prior

2001 QDRO:

> "This Order as a subsequent Qualified Domestic Relations Order
> supplements and amends the [2001 QDRO], to achieve the intent of
> this Court *concerning spousal maintenance.* *** ; *this current Order
> separately and additionally provides for the payment of* Petitioner's
> arrears of spousal maintenance to respondent and for the ongoing
> payments of spousal maintenance *from petitioner's monthly
> Retirement Plan proceeds, pursuant to the Employee Retirement
> Income Security Act.* (Exhibit 8, page 1; italics added).
> ***
> As subsequently amended, this Court has ordered petitioner to
> pay to respondent a total $1,577.27 per month as spousal maintenance,
> including the health insurance premiums and the $15.00 processing
> fee .... (Exhibit 8, page 3).
>
> The purpose of this Order is to assure that all amounts owed by
> James Huntsman to the date of this Order, including costs, interest,
> and attorney's fees, and all amounts James Huntsman is to pay
> pursuant to order of this Court as permanent spousal maintenance, *be
> paid from the periodic distributions he receives from the Employee
> Retirement Income Plan of Minnesota Mining and Manufacturing
> Company.* (Exhibit 8, page 4; italics added).
> ***
>
> **THIS SUBSEQUENT QUALIFIED DOMESTIC RELATIONS
> ORDER:**
> ***
>
> **The Court hereby orders James Huntsman, commencing on
> either January 1, 2010, or the first of the month following the date
> of this order, whichever date is last, and each month thereafter,
> to pay respondent from said [3M ERIP], in addition to the $460.89
> monthly benefit previously allocated to respondent Zenith
> Annette Huntsman from the plan, an additional sum of $2,000 per
> month from said [3M ERIP], for a total of $2,460.89 per month.**
> (Exhibit 8, page 6; bold lettering in original).
> ***
>
> It is the intention of the court thereafter, by a subsequent amended
> QDRO, to order James Huntsman to pay to Zenith Annette Huntsman

$1,577.27 per month (including medical premiums), in addition to Zenith Annette Huntsman's monthly benefit of $460.89 resulting from the original QDRO, *for a total sum of $2,038.16 per month* (including insurance .premiums), *thereafter indefinitely through the remainder of James Huntsman's life*, as permanent spousal maintenance. " (Exhibit 8, pages 6-7; italics added).

62.     The stated purpose of the 2010 proposed QDRO (Exhibit 8, page 4) was to ensure that all amounts owed Defendant Huntsman by Plaintiff to the date of the order, including costs, interest, and attorney fees, and all amounts Plaintiff is to pay pursuant to the order of the court as permanent spousal maintenance, be paid from his monthly 3M ERIP payments.

63.     On or about September 1, 2010, Defendant Huntsman submitted the 2010 proposed QDRO to the Plan Administrator for approval as a QDRO under ERISA.  On September 9, 2010, the Plan Administrator issued its Initial Determination that the 2010 proposed QDRO is a valid QDRO under ERISA.

64.     As a consequence of the 2010 proposed QDRO, deduction from Plaintiff's monthly 3M pension payments increased to **$2,000.00 per month as of October 1, 2010, being nearly two-thirds of Plaintiff's gross pension and leaving Plaintiff with only $882.55 per month after taxes as his only income,** because Plaintiff was involuntarily unemployed from August 2008 until February 2011, and had no other income from which to pay spousal maintenance.  From October 1, 2010 through December 1, 2011, said $2,000.00 per month deduction was escrowed by the Plan Administrator.  From January 1, 2012 through October 1, 2012, said $2,000.00 per month deduction was paid to Defendant Huntsman by the Plan Administrator.  See Exhibit 31, pages 1-2.

65.    On October 6, 2010, Plaintiff's attorney, Andrew J. Dawkins, filed with the 3M ERIP Plan Administrator Plaintiff's objections (see Exhibit 9 included herewith) to its Initial Determination, which objections included, inter alia: the 2010 proposed QDRO represents (1) a violation of the finality and distribution of the 3M pension property rights in Plaintiff's ERIP benefits awarded by the 2001 QDRO; (2) an impermissible use under Minnesota domestic relations law of Plaintiff's awarded 3M pension property income to pay spousal maintenance; (3) an impermissible collection of a debt under both federal and state law; and (4) even if such debt collection were permitted, in practical effect, a garnishment that exceeds the maximum levels of garnishment permitted under 15 U.S.C. §§ 1672, 1673(b)(2)(A), and Minn. Stat., § 518A.53, subd. 9(a), which incorporates 15 U.S.C. § 1673(b).

66.    On March 11, 2011, in rejecting all of Plaintiff's objections to its Initial Determination, the Plan Administrator issued its Final Determination (see Exhibit 10 included herewith) upholding its Initial Determination that the 2010 proposed QDRO is a valid QDRO under ERISA ("2010 QDRO").

67.    In its March 11, 2011 Final Determination, the Plan Administrator issued notice that its Final Determination would become effective 30 days after the date of its March 11, 2011 letter, unless prior to the expiration of that 30-day period, the Plan Administrator received written notice that Plaintiff or the Alternate Payee has commenced proceedings in a court of competent jurisdiction to review the Plan Administrator's Final Determination. See Exhibit 10, page 1.

68.    On April 6, 2011, Plaintiff commenced an action in this District Court, case

number 11-CV-844 (DSD/TNL), to challenge the Plan Administrator's March 11, 2011

Final Determination that the 2010 proposed QDRO is a valid QDRO under ERISA.

69.     On or about October 1, 2011, the Plan Administrator released $40,215.28 of

Plaintiff's escrowed pension funds to Defendant Huntsman, leaving a balance of

$13,759.80 in escrow.  See Exhibit 31, page 1.

70.     After ongoing discussions, in November 2011, the parties at that time,

stipulated to a dismissal of 11-CV-844 (DSD/TNL) without prejudice, which this Court

ordered on November 18, 2011.

71.     From January 1, 2013 through March 1, 2014, the Plan Administrator

deducted $2,000.00 per month from Plaintiff's monthly 3M ERIP pension payments, and

paid Defendant Huntsman $1,562.27 therefrom and escrowed the balance of $437.73 per

month.  See Exhibit 31, page 2.

72.     On May 22, 2013, the state court issued its *Subsequent Qualified Domestic

Relations Order for the Employee Retirement Income Plan of Minnesota Mining and

Manufacturing Company* ("2013 proposed Subsequent QDRO"; see Exhibit 11 included

herewith), which provided, in part, on pages 5-6 therein:

> **"PURPOSES OF THIS SUBSEQUENT QUALIFIED DOMESTIC RELATIONS ORDER AT THIS TIME:**
>
> One purpose of this Order is to order James Huntsman to pay spousal maintenance to Zenith Huntsman from the periodic distributions he receives from the Employee Retirement Income Plan of Minnesota Mining and Manufacturing Company.  The Court finds that James Huntsman currently receives $3,259.09 [estimated starting on June 1, 2007] gross per month from said Plan, and that Zenith Annette Huntsman is currently entitled to receive spousal maintenance, payments of $1,562.27 per month (including medical insurance premium payment of $263.00 per month) from James Huntsman's

monthly pension payment from said Plan.  James Huntsman shall receive $1,696.82 gross per month from said Plan.

***

A second purpose of this Order is to immediately release to James Huntsman the remaining pension funds escrowed for his previous supersedeas security, in the amount of $15,481.02, plus accrued interest on his escrowed funds, if any, except for $7,000.00 which shall remain escrowed as supersedeas security during the pendency of the appeal, A12-2147."

73.     On January 10, 2014, the Plan Administrator made an Initial Determination that the 2013 proposed Subsequent QDRO was a QDRO ("2013 Subsequent QDRO") under ERISA.

74.     On February 3, 2014, Defendant Huntsman, by and through her attorney Defendant Eggen, moved the state court to amend and clarify the 2013 proposed Subsequent QDRO, in consequence of which, on February 13, 2014, the state court issued its *Amended Supplemental Qualified Domestic Relations Order of May 22, 2013 for the Employee Retirement Income Plan of Minnesota Mining and Manufacturing Company* ("2014 proposed Amended Supplemental QDRO"; see Exhibit 12 included herewith), which provided, in part, on pages 6-7 therein:

"**PURPOSE OF THIS AMENDED SUBSEQUENT QUALIFIED DOMESTIC RELATIONS ORDER AT THIS TIME:**

The purpose of this Amended Subsequent Qualified Domestic Relations Order is to amend and clarify the Subsequent Qualified Domestic Relations Order of May 22, 2013, the final paragraph of page 5 and continuing on page 6, to restate, clarify, and emphasize the intent of the Subsequent QDRO of May 22, 2013 as follows:

The payment to Zenith Huntsman of $1,562.27 per month from James Huntsman's monthly pension payment from said Plan Account for the Employee Retirement Income Plan of Minnesota Mining and Manufacturing Company above and beyond the $460.89 monthly

benefit previously allocated to Zenith Annette Huntsman from the Plan, shall be paid continually until the first of the following events:

1) further modification of the maintenance obligation by court order;
2) the death of James Huntsman or the death of Zenith Annette Huntsman;
3) remarriage of Zenith Annette Huntsman; or
4) issuance of a new qualified domestic relations order, whichever occurs first.

It was never intended, and is not now intended, that the 3M Plan Administrator would cease paying Zenith Huntsman's spousal maintenance of $1,562.27 per month after James Huntsman's arrears of attorney's fees and spousal maintenance as recorded in recorded judgments are satisfied. The intent is that James Huntsman's payment of spousal maintenance to Annette Huntsman from said Plan will continue until subsequent order of the court, or the death of one of the parties, or remarriage of Zenith Annette Huntsman, whichever occurs first."

75.     On February 20, 2014, the Plan Administrator released $14,194.67 of its escrowed funds to Plaintiff. See Exhibit 31, page 2.

76.     On March 12, 2014, the Plan Administrator made an Initial Determination that the 2014 proposed Amended Supplemental QDRO was a QDRO under ERISA ("2014 Amended Supplemental QDRO").

77.     From April 1, 2014 through October 1, 2015, the Plan Administrator deducted $1,562.27 per month from Plaintiff's monthly 3M pension payments and paid it to Defendant Huntsman, leaving Plaintiff with a gross monthly payment of $1,696.82. See Exhibit 31, pages 2-3.

78.     From June 1, 2015 through October 1, 2015, the Plan Administrator deducted $1,562.27 from Plaintiff's monthly 3M pension payments and paid $1,400.00 to Defendant Huntsman, and escrowed $162.27 of the $1,562.27 to Defendant Huntsman's escrow

22

account, still leaving Plaintiff with a gross monthly payment of $1,696.82 (see Exhibit 31, pages 2-3).

79.     Subsequent to Plaintiff's May 2014 motion to modify his spousal maintenance, which the state court denied, on September 3, 2015, the state court issued its *Amended Subsequent Qualified Domestic Relations Order for the 3M Employee Retirement Income Plan* ("2015 proposed Amended Subsequent QDRO"), for which, on October 15, 2015, the Plan Administrator made an Initial Determination it was a valid ERISA QDRO.

80.     On November 10, 2015, Plaintiff appealed the Initial Determination (see Exhibit 13 included herewith), on grounds that, inter alia, the Plan Administrator lacked jurisdiction to make the Initial Determination while the underlying September 2, 2015 Order and the 2015 proposed Amended Subsequent QDRO were being appealed in the Minnesota Court of Appeals.

81.     On February 17, 2016, the Plan Administrator denied Plaintiff's November 10, 2015 appeal and made a Final Determination (see Exhibit 14 included herewith) that the 2015 proposed Amended Subsequent QDRO is a valid QDRO under ERISA ("2015 Amended Subsequent QDRO"; see Exhibit 15 included herewith).

82.     The 2015 Amended Subsequent QDRO (Exhibit 15) provides, in part, on pages 2-3 therein:

> "On September 2, 2015, this Court found that the current amount for *arrears of spousal maintenance due by James Huntsman to Zenith Annette Huntsman is $4,029.53*, and the Court awarded Zenith Annette Huntsman *additional attorney's fees in the total amount of $14,498.10*; both the outstanding spousal maintenance arrears and attorney's fees judgments awarded on September 2, 2015 are subject to statutory interest ongoing.

This present Amended Subsequent QDRO amends and clarifies all prior Qualified Domestic Relations Orders of this Court in this matter to provide for the ongoing payment of $1,400.00 per month to Respondent for spousal maintenance from Petitioner's monthly Retirement Plan proceeds, pursuant to the Employee Retirement Income Security Act, and supersedes all of the aforesaid February 14, 2001 QDRO, the August 24, 2010 QDRO, the May 22, 2013 Subsequent QDRO, and the February 13, 2014 Amended Supplemental QDRO. In addition, the purpose of this Order is to require and order the payment to Zenith Annette Huntsman all amounts held in escrow by the Plan and require and order payment of $600 per month (in addition to the $1,400 per month) from said Plan Account above and beyond the $460.89 monthly benefit directly received by Zenith Annette Huntsman, *to be allocated to the payment of outstanding arrears of maintenance and attorney's fees as listed above*." (italics added).

83.     The 2015 Amended Subsequent QDRO (Exhibit 15) further provides, in part, on pages 6-7 therein:

"The purpose of this Amended Subsequent Qualified Domestic Relations Order is to amend and clarify the Amended Supplemental Qualified Domestic Relations Order of February 13, 2014, the final paragraph on page 6 and continuing on page 7, to revise the Amended Subsequent Qualified Domestic Relations Order of February 13, 2014 as follows: The payment to Zenith Huntsman of $1,400.00 per month from James Huntsman's monthly pension payment from said Plan Account for the Employee Retirement Income Plan of Minnesota Mining and Manufacturing Company above and beyond the $460.89 monthly benefit previously allocated to Zenith Annette Huntsman from the Plan, shall be paid continually until the first of the following events:

1) further modification of the maintenance obligation by court order;
2) the death of James Huntsman or the death of Zenith Annette Huntsman;
3) remarriage of Zenith Annette Huntsman; or
4) issuance of a new qualified domestic relations order, whichever occurs first.

24

In addition, James Huntsman shall pay Zenith Annette Huntsman from the funds held in escrow since June 1, 2015 by the 3M Plan all funds currently held, in reduction of James Huntsman's outstanding judgment to pay maintenance.

In addition, James Huntsman shall pay to Zenith Annette Huntsman from James Huntsman's monthly pension payment provided in said Plan Account, the sum of $600 monthly (above and beyond the $1,400 spousal maintenance payment and the $460.89 monthly benefit previously allocated to Zenith Annette Huntsman from the Plan) as an ongoing monthly payment toward the September 2, 2015 Judgment. This additional sum shall be paid continually until the first of the following events:

1) further modification of the maintenance obligation by court order;
2) the death of James Huntsman or the death of Zenith Annette Huntsman;
3) the issuance of a new qualified domestic relations order; or
4) *the filing in court of a Satisfaction of Judgment duly executed by James Huntsman which states that the September 2, 2015 Judgment has been fully satisfied.*" (italics added).

84.    From November 1, 2015 through May 1, 2016, the Plan Administrator deducted $2,162.27 per month from Plaintiff's monthly 3M ERIP pension payments, escrowed $600.00 of the $2,162.27 to Plaintiff's escrow account, paid $1,400.00 to Defendant Huntsman, and escrowed $162.27 of the $2,162.27 to Defendant Huntsman's escrow account, leaving Plaintiff with a gross monthly payment of $1,096.82 (see Exhibit 31, page 3.

85.    From June 1, 2016 through January 1, 2018, the Plan Administrator deducted $2,000.00 per month from Plaintiff's monthly 3M ERIP pension payments and paid said $2,000.00 to Defendant Huntsman, leaving Plaintiff with a gross payment of $1,259.09. See Exhibit 31, page 3).

86.     On November 1, 2016, at age 70, Plaintiff's job as a patent paralegal at CPA Global North America's office in Minneapolis, MN was involuntarily terminated and relocated to CPA Global's subsidiary office in India.

87.     In mid-November 2016, after a workout at a local gym, Plaintiff nearly passed out. Subsequent medical testing and diagnoses in the Twin Cities, MN, and at the Mayo Clinic in Rochester, MN indicated that Plaintiff had suffered a heart attack in the past and had heart disease.

88.     After finding a job as a paralegal in Minneapolis, MN in January 2017, due to the stress of that job, Plaintiff sometimes experienced lightheadedness and physical weakness.

89.     In March 2017, in follow-up medical examinations and testing for his heart disease, Plaintiff was diagnosed with highly aggressive prostate cancer (Gleason score of 10, plus perineural invasion), and, facing imminent extensive radiation treatments at the Mayo Clinic in Rochester, MN, he completely retired from employment, having to depend on his 3M ERIP pension payments and Social Security benefits as his only income.

90.     Not being able to garnish Plaintiff's paralegal employment paychecks, on April 26, 2017, Defendant Huntsman, by and through her attorney Defendant Eggen, made five motions to the state court, which included her motion to amend the 2015 Amended Subsequent QDRO to increase Plaintiff's monthly 3M ERIP deduction to $3,000.00 from Plaintiff's monthly $3,259.09 3M ERIP pension payments, the $1,000.00 increase in the deduction from $2,000.00 to pay toward Defendant Huntsman's attorney fees judgment awards because allegedly Defendant Eggen felt he was not being paid quickly enough

26

through the 2015 Amended Subsequent QDRO at $600.00 per month.

91.    On June 7, 2017, Defendant Huntsman, by and through her attorney Defendant Eggen, filed a full satisfaction (see Exhibit 16 included herewith) that as of May 1, 2017, after having used $1,109.39 of two $600 payments to Defendant Huntsman deducted from two of Plaintiff's monthly 3M ERIP pension payments, Plaintiff had satisfied in full the $14,498.10 judgment for attorney fees in the 2015 Amended Subsequent QDRO (see Exhibit 15, pages 2-3 regarding the $14,498.10 judgment; also paragraphs 82, 83 above).

92.    On November 13, 2017, Defendant Eggen, on behalf of Defendant Huntsman, filed a partial satisfaction (see Exhibit 17 included herewith) stating that as of October 1, 2017, he had applied $3,090.61 from several full and partial $600 payments deducted from Plaintiff's monthly 3M ERIP pension payments, toward a partial satisfaction of a Minnesota Court of Appeals judgment for appellate attorney fees in favor of Defendant Huntsman, citing the 2015 Amended Subsequent QDRO as justification for doing so, despite the fact that the 2015 Amended Subsequent QDRO expressly authorized those $600 payments toward satisfaction of only the two September 2, 2015 judgments for $14,498.10 and $4,029.53 (see Exhibit 15, pages 2-3; also paragraphs 82 and 83 above).

93.    On November 17, 2017, at age 71, based on his adverse health and retirement, Plaintiff filed in state court a motion for modification and termination of his spousal maintenance, which was denied in the state court's September 6, 2018 order, which is presently subject to post-judgment actions, including state court appeal.

94.    On November 21, 2017, Plaintiff filed a full satisfaction of the $4,029.53 September 2, 2015 judgment (see Exhibit 18 included herewith) in compliance with the 2015 Amended Subsequent QDRO (Exhibit 15, pages 2, 3, 6, 7; see paragraphs 82 and 83 above), citing indisputable documentation of his payments in full of the $4,029.53 judgment.

95.    The Washington County Minnesota District Court Administration accepted Plaintiff's November 21, 2017 full satisfaction of the $4,029.53 September 2, 2015 judgment (see Exhibit 19 included herewith) and recorded that satisfaction (see Index # 1464 in the parties' state court case registry).

96.    On November 22, 2017, Plaintiff sent a letter (see Exhibit 20 included herewith) to the Plan Administrator requesting that it cease making monthly $600 payments to Defendant Huntsman because he had filed a full satisfaction of the $4,029.53 judgment, in compliance with the 2015 Amended Subsequent QDRO (Exhibit 15, pages 2, 3, 6, 7; see paragraphs 82 and 83 above).

97.    On December 20, 2017 and January 8, 2018, Defendant Eggen, on behalf of Defendant Huntsman, filed partial satisfactions (see Exhibit 21 included herewith) stating he had applied $1,800.00 from three $600 payments deducted from Plaintiff's monthly 3M ERIP pension payments, again toward partial satisfaction of a Minnesota Court of Appeals judgment for appellate attorney fees in favor of Defendant Huntsman, citing the 2015 Amended Subsequent QDRO as justification for doing so, despite the fact that the 2015 Amended Subsequent QDRO did not authorize those $600 payments toward satisfaction of any judgments other than the two September 2, 2015 judgments for $14,498.10 and

$4,029.53 (see Exhibit 15, pages 2-3; also paragraphs 82 and 83 above).

98.     On January 2, 2018, the Plan Administrator sent Plaintiff a letter (see Exhibit 22 included herewith) in which the Plan Administrator reviewed Plaintiff's November 22, 2017 letter (see Paragraph 96) and determined that the 2015 Amended Subsequent QDRO had been satisfied regarding satisfaction of the September 2, 2015 judgments so that the $600 monthly payments to Defendant Huntsman would cease, and Plaintiff would begin receiving the $600 monthly amounts.

99.     From February 1, 2018 through July 1, 2018, the Plan Administrator deducted $1,400.00 per month from Plaintiff's monthly 3M ERIP pension payments and paid said $1,400.00 to Defendant Huntsman, leaving Plaintiff with a gross payment of $1,859.09. See Exhibit 31, page 3.

100.    On June 20, 2018, the state court granted Defendant Huntsman's April 26, 2017 motion to amend the 2015 Amended Subsequent QDRO and issued the *Amended Subsequent Qualified Domestic Relations Order for the 3M Employee Retirement Income Plan* ("2018 proposed Amended Subsequent QDRO"; see Exhibit 23 included herewith), which provides, in part:

> "This present Amended Subsequent QDRO amends and clarifies all prior Qualified Domestic Relations Orders of this Court in this matter to provide for the ongoing payment of $1,600 per month (in addition to the $1,400 per month) from said Plan Account above and beyond the $460.89 monthly benefit directly received by Zenith Annette Huntsman, to be allocated to the payment of outstanding arrears of maintenance and attorney's fees as listed above. (Exhibit 23, pages 4-5).
>
> *The purpose of this Amended Subsequent Qualified Domestic Relations Order is to amend and clarify the Amended Supplemental Qualified Domestic Relations Order for the 3M Employee Retirement Income Plan,*

*filed September 3, 2015* on page 6 and continuing on page 7, to revise the Amended Subsequent Qualified Domestic Relations Order for the 3M Employee Retirement Income Plan, filed September 3, 2015, as follows:

> The payment to Zenith Huntsman of $1,400.00 per month from James Huntsman's monthly pension payment from said Plan Account for the Employee Retirement Income Plan of Minnesota Mining and Manufacturing Company above and beyond the $460.89 monthly benefit previously allocated to Zenith Huntsman from the Plan, shall be paid continually until the first of the following events:
>
> 1) further modification of the maintenance obligation by court order;
> 2) the death of James Huntsman or the death of Zenith Annette Huntsman;
> 3) remarriage of Zenith Annette Huntsman; or
> 4) issuance of a new qualified domestic relations order, whichever occurs first.
>
> In addition, James Huntsman shall pay to Zenith Annette Huntsman from James Huntsman's monthly pension payment provided in said Plan Account, *the sum of $1,600 monthly (above and beyond the $1,400 spousal maintenance payment* and the $460.89 monthly benefit previously allocated to Zenith Annette Huntsman from the Plan) *as an ongoing monthly payment toward the September 2, 2015 Judgment.* This additional sum shall be paid continually until as soon as reasonably practicable after the Plan Administrator is notified of the first of the following events:
>
> 1) further modification of the maintenance obligation by court order;
> 2) the death of James Huntsman or the death of Zenith Annette Huntsman;
> 3) the issuance of a new qualified domestic relations order; or
> 4) the filing in court of a satisfaction of Judgment duly executed by Zenith Annette Huntsman which states that the judgments of September 3, 2015 (two judgments, one for attorneys fees and one for maintenance), June 6, 2016 (for costs and attorneys fees), November 21, 2016 from the Minnesota Supreme Court (for attorneys fees), and December 29, 2016 (for costs and attorneys fees) have been fully satisfied.

Respondent and Petitioner, each individually, shall deliver written notice of the occurrence of any of the above-identified events to the Plan

Administrator at the address listed below within fifteen (15) days of his or her becoming aware of such occurrence." (Exhibit 23, pages 10-11; italics added).

101.    The 2018 proposed Amended Subsequent QDRO provides, inter alia, that a total of $3,000.00 per month be taken from Plaintiff's $3,259.09 gross per month 3M ERIP pension payments and distributed to Defendant Huntsman, as $1,400.00 per month for ongoing spousal maintenance, and $1,600.00 per month "as an ongoing monthly payment toward the September 2, 2015 Judgment.", thereby **leaving only $259.09 gross per month for Plaintiff toward his living expenses.**

102.    The 2018 proposed Amended Subsequent QDRO expressly and unambiguously directs the monthly $1,600 deduction from Plaintiff's 3M pension payments be paid **"as an ongoing monthly payment toward the September 2, 2015 Judgment."** (see paragraph 100), **and to no other judgment.** Because the $14,498.10 and had already been fully satisfied (see Exhibit 16), **only the $4,029.53 judgment allegedly remains unpaid and must be the only judgment paid by Plaintiff's $1,600 monthly payments, as required by 2018 proposed Amended Subsequent QDRO.**

103.    Shortly after June 20, 2018, Defendant Huntsman submitted the 2018 proposed Amended Subsequent QDRO to the Plan Administrator for determination as a QDRO under ERISA, which the Plan Administrator admitted it received in its letter of June 25, 2018 to Plaintiff and Defendant Huntsman.

104.    By Plaintiff's letter of July 13, 2018 (see Exhibit 24 included herewith) to the Plan Administrator via the 3M Qualified Order Team, on pages 1 and 2 therein, in response to a phone message to Plaintiff from 3M's FIRST Line Center (1) that the Plan

Administrator had initially determined that the 2018 proposed Amended Subsequent

QDRO is a valid QDRO, and (2) that escrowing of $1,600.00 per month would begin on

August 1, 2018, Plaintiff objected to Defendant 3M's escrowing only $1,600 per month as

violating 29 U.S.C. § 1056(d)(3)(H)(i):

"Under 29 U.S.C. § 1056(d)(3)(H)(i):

> During any period in which the issue of whether a domestic relations order is a qualified domestic relations order is being determined (by the plan administrator, by a court of competent jurisdiction, or otherwise), the plan administrator shall separately account for the **amounts** (hereinafter in this subparagraph referred to as the "segregated amounts") **which would have been payable to the alternate payee during such period if the order had been determined to be a qualified domestic relations order.** (bold in original letter).

> Because in the June 2018 QDRO, the "amounts (plural) … which would have been payable to the alternate payee during such period if the order had been determined to be a qualified domestic relations order" total $3,000.00 (= $1,400.00 (spousal maintenance) + $1,600.00 (toward other judgments)), then, when escrow commences, the $3,000.00 payable to the Alternate Payee should be escrowed, and *I request $3,000.00 per month be the amount escrowed until a final determination is made. This is consistent with the previous similar escrow 3M did pursuant to the August 24, 2010 QDRO, wherein $2,000 per month ($1,562.27 (maintenance) + $437.73 ("catch-up" payments)) was escrowed until that QDRO's final determination."* (italics added).

105.    In its letter of July 18, 2018 (Exhibit 25 included herewith), the Plan

Administrator stated, inter alia, that Plaintiff's July 13, 2018 letter "is procedurally

improper and premature, and, accordingly, no substantive response is required to his

letter."

106.    On July 20, 2018, the Plan Administrator made an Initial Determination that

the 2018 proposed Amended Subsequent QDRO is a valid QDRO under ERISA ("2018

Amended Subsequent QDRO"), as shown in Exhibit 26 included herewith.

107.    By his letter of July 20, 2018 (Exhibit 27 included herewith) to the Plan Administrator via the 3M Qualified Order Team, Defendant Eggen, on behalf of Defendant Huntsman, requested that Defendant Huntsman receive $600 per month *on grounds of compliance with the 2015 Amended Subsequent QDRO*, despite the fact that the 2015 Amended Subsequent QDRO had been superseded by the 2018 Amended Subsequent QDRO.

108.    By Plaintiff's letter of July 27, 2018 (Exhibit 28 included herewith) to the Plan Administrator via the 3M Qualified Order Team, on pages 1 and 2 therein, Plaintiff again demanded that given the terms of the 2018 Amended Subsequent QDRO, under 29 U.S.C. § 1056(d)(3)(H)(i), $3,000.00 per month must be escrowed from his monthly 3M ERIP pension payments, pending the final outcome of the determination of whether the 2018 Amended Subsequent QDRO is a valid QDRO under ERISA.

109.    By his letter of July 27, 2018 (Exhibit 29 included herewith) to the Plan Administrator, Defendant Eggen, on behalf of Defendant Huntsman, stated that the 2015 Amended Subsequent QDRO remained enforceable and also requested that effective August 1, 2018, Defendant Huntsman receive $600 per month on grounds of compliance with the 2015 Amended Subsequent QDRO as if the 2018 Amended Subsequent QDRO did not supersede the 2015 Amended Subsequent QDRO. Defendant Eggen also requested that Defendant Huntsman receive $1,600 per month on grounds of compliance with the 2018 Amended Subsequent QDRO. That is, the Plan Administrator should enforce both part of the 2015 Amended Subsequent QDRO and the 2018 Amended Subsequent QDRO

at the same time.

110.    As shown in Exhibit 31, page 3, on August 1, 2018 and September 1, 2018,

the Plan Administrator deducted $3,000.00 from Plaintiff's gross monthly 3M ERIP

pension payments and paid $1,400.00 thereof to Defendant Huntsman, and escrowed

$1,600.00 thereof to Plaintiff's escrow account, leaving Plaintiff only $259.09 gross as his

monthly BASE Q (see Exhibit 30 included herewith for Plaintiff's August 1, 2018 pension

payment statement).

111.    On August 17, 2018, Plaintiff duly submitted to the Plan Administrator his

Appeal of its July 20, 2018 Initial Determination of the 2018 Amended Subsequent QDRO

as shown in Exhibit 32 included herewith.

112.    The grounds for Plaintiff's Appeal (Exhibit 32 included herewith), include,

inter alia, that:

      (1)   the 2018 Amended Subsequent QDRO violates the final, non-modifiable property division of Plaintiff's 3M ERIP benefits between the Plaintiff and Defendant Huntsman, in which Defendant Huntsman had validly waived all her rights in and to all of Plaintiff's 3M pension benefits as of and after April 2, 1999, awarded Plaintiff by the 2001 QDRO;

      (2)   the 2018 Amended Subsequent QDRO is null and void, as are all other QDROs subsequent to the 2001 QDRO. See *Fontaine v. Guth*, 402 F.3d 1083, 1084 (11th Cir. 2005);

      (3)   the 3M Plan Administrator lacks jurisdiction to determine whether the null and void 2018 Amended Subsequent QDRO is a valid QDRO under ERISA;

      (4)   Plaintiff may recover all the distributions or payments deducted from his 3M ERIP benefits and paid to Defendant Huntsman under the June 2018 Amended QDRO and also under all the null and void amended QDROs subsequent to the 2001 QDRO. See *Fontaine v. Guth*, No. 3:02-CV-067-JTC, 2009 U.S. Dist. LEXIS 140057, *9-*10 (N.D. Ga. 2009);

34

(5) the 2018 Amended Subsequent QDRO violates Minnesota and federal law by withholding, taking, or, in practical effect, garnishing unlawfully excessive amounts from Plaintiff's monthly 3M ERIP benefits and distributing said amounts to the Defendant Huntsman;

(6) the 2018 Amended Subsequent QDRO is not a DRO because it was not validly made pursuant to Minnesota domestic relations law because it improperly uses Plaintiff's pension property income to pay spousal maintenance;

(7) distributions or payments from the Plaintiff's 3M ERIP benefits paid to Defendant Huntsman under equity are not permissible under ERISA; and

(8) distributions or payments from the Plaintiff's 3M ERIP benefits and paid toward Defendant Huntsman's attorney fees pursuant to the 2018 Amended Subsequent QDRO are not permissible under ERISA and the 2001 QDRO.

113.    In its letter of September 5, 2018 (Exhibit 33 included herewith), on page 3, the Plan Administrator, citing, inter alia, Defendant Eggen's July 20, 2018 letter to the Plan Administrator (Exhibit 27), stated that "As a result of the foregoing, the Plan Administrator has determined that the 3M Plan shall re-commence making the additional $600 monthly payments to Ms. Huntsman as soon as administratively practical."

114.    On October 10, 2018, Defendant Eggen filed a partial satisfaction in state court in the amount of $1,800.00 (Exhibit 34 included herewith), from an $1,800.00 payment "Collected From   QDRO (September 3, 2015) [*three $600 escrowed payments under the September 3, 2015 QDRO received from the 3M Plan Administrator  pursuant to the release of escrowed QDRO payment]*" **toward a state appellate court judgment for attorney fees, contrary to the express direction of the 2018 Amended Subsequent QDRO that the $600 payments be paid toward the September 2, 2015 $4,029.53 judgment, also stated in the 2015 Amended Subsequent QDRO.** (italics in Exhibit 33;

bold lettering added).  See paragraphs 82, 83, and 100 above.

115.    By his letter of October 22, 2018 (Exhibit 35 included herewith) to the Plan Administrator, Plaintiff (1) reminded the Plan Administrator that Plaintiff had not yet received the accounting of distributions from his 3M ERIP pension benefit payments that **Plaintiff had requested in his August 17, 2018 Appeal**; (2) claimed the release of the $1,800.00 to Defendant Huntsman was improper; (3) claimed that use of the $1,800.00 as a partial satisfaction toward an appellate judgment instead of toward the $4,029.53 September 2, 2015 judgment was improper; and (4) put the Plan Administrator on notice that if it continued to release payments to Defendant Huntsman instead of escrowing them, and he prevailed in his appeal of the 2018 Amended Subsequent QDRO, he would make a claim against the Plan Administrator for all non-escrowed funds released to Defendant Huntsman that he is unable to recover from Defendant Huntsman.

116.    In its letter of November 1, 2018 (Exhibit 36 included herewith), inter alia, on page 5, the Plan Administrator stated that "Accordingly, the Plan Administrator reaffirms its determination of September 13, 2018 to re-commence making the additional $600 monthly payments to Ms. Huntsman."

117.    On November 20, 2018, the Plan Administrator mailed Plaintiff its first Final Determination ("November 20, 2018 Final Determination"; see Exhibit 37 included herewith) that the 2018 proposed Amended Subsequent QDRO "constitutes a QDRO" under 29 U.S.C. § 1056(d)(3) of ERISA, but said Final Determination did not include any attachments as copies of the documents it cited in its Background section on page 2 therein.

118.    On November 28, 2018, the 3M Plan Administrator mailed Plaintiff a second Final Determination ("November 28, 2018 Final Determination"; see Exhibit 38 included herewith, which excludes the attachments mailed therewith), stating that "***THIS CORRESPONDENCE IS IDENTICAL TO THAT DATED AND SENT ON NOVEMBER 20, 2018 ...***", but included as attachments copies of several documents it cited in its Background section on page 2 therein, which attachments did not include the October 23, 2018 letter from Defendant Eggen on behalf of Defendant Huntsman, opposing Plaintiff's Appeal. (bold italics in original).

119.    On page 8 of the Plan Administrator's November 28, 2018 Final Determination (Exhibit 38) is stated:

> "**This** Final Determination will become effective 30 days after the date which appears above, unless, prior to the expiration of the 30-day period, the Plan Administrator receives written notice that the Plan Participant, James Huntsman, or the Alternate Payee, Zenith Huntsman, has commenced proceedings in a court of competent jurisdiction to review the Plan Administrator's determination." (bold added).

From that plain language, Plaintiff determined that the "30-day period" in the Plan Administrator's November 28, 2018 Final Determination expired on December 28, 2018.

120.    Defendant Eggen did not provide Plaintiff a copy of his October 23, 2018 letter to the Plan Administrator, despite said letter's indication at its end that Defendant Eggen did provide a copy by U.S. Mail and email to Plaintiff, nor did the Plan Administrator inform Plaintiff of its receipt of Defendant Eggen's October 23, 2018 letter, or provide Plaintiff with a copy of it in its November 28, 2018 Final Determination mailing to Plaintiff.

37

121.    By his letter of December 4, 2018 (Exhibit 39 included herewith) to the Plan Administrator, Plaintiff sought clarification of its November 28, 2018 Final Determination, especially regarding the date that the "30-day period" ended, and **for a third time, requested an accounting of the deduction from his 3M ERIP payments paid to Defendant Huntsman** or any other person or entity, necessary for Plaintiff to accurately quantify his claims of damages herein.

122.    Because the Plan Administrator has declared the November 28, 2018 Final Determination correspondence to be identical to the November 20, 2018 Final Determination, unless otherwise clarified or distinguished, hereinafter "Final Determinations" shall refer to both the Plan Administrator's November 20, 2018 Final Determination and its November 28, 2018 Final Determination.

123.    In its letter of December 14, 2018 (Exhibit 40 included herewith; letter only, excludes enclosures, including Exhibit 31), the Plan Administrator finally provided Plaintiff with his requested 3M pension payment accounting (Exhibit 31).  Exhibit 40 provides that Plaintiff has until January 4, 2019 to "provide written notice of his commencement of legal proceedings to the Plan Administrator."

124.    As shown in Exhibit 31, page 3, as of August 1, 2018, the Plan Administrator deducts $3,000.00 per month from Plaintiff's gross monthly 3M ERIP pension payments and pays $2,000.00 (= $1,400.00 + $600.00) thereof to Defendant Huntsman, and **escrows only $1,000.00 thereof** to Plaintiff's escrow account, leaving Plaintiff only $259.09 gross as Plaintiff's monthly 3M ERIP pension payment.  On October 1, 2018, the Plan Administrator paid Defendant Huntsman $1,200 **from Plaintiff's escrow balance of**

**$3,200.00**, in addition to said $2,000.00, thereby effectively deducting $600.00 from Plaintiff's escrow account for August 1 and September 1, 2018.

125.    Although the Plan Administrator's accounting in Exhibit 31 ends as of December 1, 2018, Plaintiff alleges and claims that the Plan Administrator's monthly payments to Plaintiff and Defendant Huntsman and monthly escrowing for January 1, 2019, and continuing thereafter is the same as for December 1, 2018, because Plaintiff's January 1, 2019 gross pension payment is $259.09 (Exhibit 42 included herewith), the same as for his December 1, 2018 payment.

126.    Based upon information in Exhibit 31 of the Plan Administrator's monthly accounting of Plaintiff's 3M ERIP payments paid to Plaintiff, paid to Defendant Huntsman, and escrowed, Plaintiff estimates that from December 1, 2008 through January 1, 2019, **$213,145.90** have been unlawfully deducted from Plaintiff's 3M ERIP payments by the Plan Administrator and paid directly to Defendant Huntsman, or eventually paid to Defendants Eggen and Eggen Law Office by Defendant Huntsman, in violation of the 2001 QDRO, and continue to be unlawfully paid to Defendant Huntsman at $2,000.00 per month in violation of the 2001 QDRO and 29 U.S.C. § 1056(d)(3)(H)(i). See Exhibit 41, included herewith, prepared by Plaintiff based on Defendant 3M's accounting in Exhibit 31, page 4 therein.

127.    Plaintiff estimates that from December 1, 2008 through February 20, 2014, the net accrued deductions of $105,975.08 from Plaintiff's 3M ERIP payments accrued interest at 4% simple annual interest of $10,093.71. See Exhibit 41, pages 1, 2.

128.     The $14,194.67 payment on February 20, 2014 to Plaintiff was his escrowed balance thereof.  The $14,194.67 is first paid toward accrued interest of $10,093.71 as of February 20, 2014, leaving $4,100.96 (= $14,194.67 – $10,093.71) paid toward the accrued deductions of $105,975.08 as of February 20, 2014, resulting in net accrued deductions of $101,874.12 (= $105,975.08 – $4,100.96) as of February 20, 2014.  See Exhibit 31, page 2, and Exhibit 41, page 2.

129.     The net accrued deductions of $101,874.12 accrued interest at Minnesota statutory 4.00% simple annual interest from February 20, 2014 through January 1, 2019, of $19,829.63 in Plaintiff's favor.  See Exhibit 41, page 2.

130.     Plaintiff is owed **$213,145.90**, as unlawful monthly deductions from his monthly 3M ERIP payments from December 1, 2008 through January 1, 2019, unlawfully pursuant to the 2010 QDRO, 2013 Subsequent QDRO, 2014 Amended Supplemental QDRO, 2015 Amended Subsequent QDRO, and 2018 Amended Subsequent QDRO, and in violation of the 2001 QDRO, made by Defendant 3M and paid to Defendant Huntsman, with said unlawful deductions continuing after January 1, 2019 at $3,000.00 per month.  Exhibit 41, in particular page 4.

131.     Plaintiff is also owed **$29,784.91,** as Minnesota statutory interest accrued on said $213,145.90 at 4.00% simple annual interest from December 1, 2008 through January 1, 2019, with said interest continuing to accrue after January 1, 2019.  See Exhibit 41, page 4.

132.     Wherefore, Plaintiff is owed **$242,930.81** (= $213,145.90 + $29,784.91) from Defendants Huntsman, Eggen, and Eggen Law Office, jointly and severally, in

consequence of wrongful deductions from his monthly 3M ERIP payments paid to Defendant Huntsman from December 1, 2008 to January 1, 2019, in violation of the 2001 QDRO, and unlawfully pursuant to the null and void QDROS since the 2001 QDRO, and continuing thereafter, plus interest thereon. See Exhibit 41, page 4.

133.    Plaintiff also claims that of his claimed $242,930.81, he is owed **$12,000.00** from Defendant 3M in consequence of its escrowing only $1,000.00 per month since August 1, 2018 through January 1, 2019, and continuing to accrue at $2,000.00 per month after January 1, 2019, by Defendant 3M's not escrowing $3,000.00 per month, in violation of 29 U.S.C. § 1056(d)(3)(H)(i).

134.    Of Plaintiff's claimed $242,930.81, Plaintiff is owed $18,000.00 from Defendants Eggen and/or Eggen Law Office, with allocated accrued interest thereon, as of October 10, 2018, as amounts deducted from Plaintiff's 3M ERIP and paid to Defendant Huntsman by Defendant 3M in violation of the 2001 QDRO, and subsequently paid by Defendant Huntsman to Defendants Eggen and/or Eggen Law Office, as designated and quantified in the partial and full satisfactions filed by Defendant Eggen (see Exhibit 43 included herewith), citing the amounts for Plaintiff's payments in those satisfactions and citing the grounds for those amounts as one or more QDROs subsequent to the 2001 QDRO. In practical effect, Defendant Huntsman was a conduit to Defendants Eggen and/or Eggen Law Office for the $18,000 in deductions from Plaintiff's 3M ERIP in violation of the 2001 QDRO payments paid to Defendant Huntsman by Defendant 3M.

### COUNT I: Urgent Temporary Injunctive Relief

135.    Plaintiff restates and realleges the allegations and claims in Paragraphs 1

through 134 and are hereby incorporated as if fully set forth herein.

136. Paragraphs 90, 100, 101, 102, 104, 108, 110, 124, 130, and 133 show that given that the amounts of payments of $3,000.00, or $1,600.00 thereof, are to be paid to Defendant Huntsman from Plaintiff's monthly 3M ERIP pension payments if the 2018 Amended Subsequent QDRO is valid, Defendant 3M has not escrowed, and continues not to escrow, the $3,000.00 per month that Defendant 3M deducts from Plaintiff's monthly 3M ERIP pension payments, as required by under 29 U.S.C. § 1056(d)(3)(H)(i), despite Plaintiff's demand for such escrow as shown in paragraph 104. From August 1, 2018 through January 1, 2019, Defendant 3M has escrowed only $1,000.00 of each said $3,000.00, and has paid $2,000.00 per month paid to Defendant Huntsman, so that the unescrowed amount is $12,000.00, and Defendant 3M continues to escrow at only $1,000.00 per month since January 1, 2019, in violation of 29 U.S.C. § 1056(d)(3)(H)(i).

137. Defendant 3M's failure to escrow the full $3,000.00 per month deducted from Plaintiff's monthly 3M ERIP pension payments is very likely to cause irreparable financial harm to Plaintiff by his not being able to recover such unescrowed $3,000.00 deductions if Plaintiff prevails in this action because of Defendant Huntsman's past refusal, and likely future refusal or inability, to pay Plaintiff judgment awards in Plaintiff's favor and against Defendant Huntsman.

138. Defendant 3M has, by its failure to escrow the full $3,000.00 per month deducted from Plaintiff's monthly 3M ERIP pension payments, infringed and denied Plaintiff's substantive and procedural due-process 3M-ERIP-pension-property rights under 29 U.S.C. § 1056(d)(3)(H)(i) and under the U.S. Constitution, Amends. V, XIV, Section

1, and the Minnesota Constitution, Art. I, Section 7.

139.     Wherefore, temporary injunctive relief against Defendant 3M to stop making any and all payments or distributions, including the current $2,000.00 per month, from Plaintiff's monthly 3M ERIP pension payments to Defendants Huntsman, Eggen, or Eggen Law Office, and an order that Defendant 3M immediately escrow, and continue to escrow, said $3,000.00 monthly deductions, pending the final determination whether the 2018 Amended Subsequent QDRO is a valid DRO under Minnesota domestic relations law and a valid QDRO under ERISA, are appropriate and necessary to safeguard Plaintiff's due-process 3M-ERIP-pension-property rights to, and recovery of, his 3M ERIP pension payments currently deducted by Defendant 3M pursuant to the 2018 Amended Subsequent QDRO.

## COUNT II: All QDROs Subsequent to the 2001 QDRO, Including the 2018 Amended Subsequent QDRO, Are Null and Void

140.     Plaintiff restates and realleges the allegations and claims in Paragraphs 1 through 139 and are hereby incorporated as if fully set forth herein.

141.     The 2001 QDRO constitutes an equitable division of Plaintiff's 3M ERIP pension property benefits and rights between Plaintiff and Defendant Huntsman as of and after April 2, 1999, and, under Minnesota domestic relations law and the Judgment and Decree, the 2001 QDRO is a final equitable property division and not subject to modification: "These payments shall be made in all events, **the provisions of the Judgment and Decree shall not be modified by any change of circumstances of either party.**" (See paragraph 31 above), and  "[T]he foregoing [QDRO 3M ERIP property

division] shall be deemed to **constitute a full, final and complete property settlement between the parties.**" (See paragraph 32 above).  The 2018 Amended Subsequent QDRO unlawfully modifies the 2001 QDRO to deny Plaintiff's his full monthly 3M ERIP pension payments under the 2001 QDRO.

142.    Because the 2001 QDRO constitutes a nonmodifiable, equitable division of Plaintiff's 3M ERIP pension property benefits and rights, the 2010 QDRO, 2013 Subsequent QDRO, 2014 Amended Supplemental QDRO, 2015 Amended Subsequent QDRO, and 2018 Amended Subsequent QDRO, all of which modify Plaintiff's 3M ERIP pension benefits in the 2001 QDRO, are null and void:

> "[T]he district court[] determin[ed] that **the 1990 and 1991 QDROs, which were mutual modifications of the original 1986 QDRO, are null and void**. Georgia domestic relations law makes clear that post-judgment modification by a court of a divorce decree concerning the *equitable distribution of property* is normally not permissible." *Fontaine v. Guth*, 402 F.3d 1083, 1084 (11th Cir. 2005).  (italics in original).

143.    In particular, the 2018 Amended Subsequent QDRO is not a valid DRO pursuant to Minnesota domestic relations law because under Minnesota domestic relations law, the 2018 Amended Subsequent QDRO impermissibly and adversely to Plaintiff modified the final 3M pension property division and awards of Plaintiff's 3M ERIP's pension property benefits and rights in the 2001 QDRO and is consequently null and void. The 2018 Amended Subsequent QDRO also unlawfully ordered Plaintiff's 3M ERIP pension property award to pay spousal maintenance to Defendant Huntsman, contrary to Minnesota domestic relations law.  *Lee v. Lee*, 775 N.W.2d 631, 639 (Minn. 2009) ("[P]ension benefits that have previously been awarded as marital property cannot also be

considered income."). Therefore, the 2018 Amended Subsequent QDRO is not a valid

DRO under Minnesota domestic relations law and under 29 U.S.C. § 1056(d)(3)(B)(ii)(II)

of ERISA, and is not a valid QDRO under 29 U.S.C. § 1056(d)(3) of ERISA.

144.     The 2001 QDRO being declared not subject to future modification, the state

court divested itself of the requisite subject-matter jurisdiction to modify the 2001 QDRO,

as was done in the 2010 QDRO, 2013 Subsequent QDRO, 2014 Amended Supplemental

QDRO, 2015 Amended Subsequent QDRO, and 2018 Amended Subsequent QDRO, and

absent jurisdiction, all those QDROs issued after the 2001 QDRO were null and void *ab*

*initio* under Minnesota law:

> "But **proceedings outside the authority of the court, or in violation** or
> contravention **of statutory prohibitions, are, whether the court have
> jurisdiction of the parties and subject-matter of the action or
> proceedings, or not, utterly void**[3]. **The mere fact that the court has
> jurisdiction of the subject-matter of an action before it does not justify**
> an exercise of a power not authorized by law, or **a grant of relief to one of
> the parties the law declares shall not be granted.** *Sache v. Wallace*, 101
> Minn. 169, 173, 112 N.W. 386, 388 (1907).

> "[B]ut in all cases where the court exceeds its jurisdiction, and want of
> jurisdiction appears upon the face of the record, **the judgment may be
> attacked at any time, before or after the time for appeal, even by a
> person not a party to the action, but who is affected thereby in his
> property rights."** *Id.* at 101 Minn. 171, 112 N.W. 387.

> "Section 518.64[4], which provides for alteration of orders or decrees, states in
> part that 'all divisions of real and personal property provided by sections
> 518.58 and 518.59 **shall be final ...' The Court is without authority to
> change a division of** real and **personal property** after the original decree
> has been entered and time for appealing therefrom has expired. (citation
> omitted.)." *Mikkelsen v. Mikkelsen*, 286 Minn. 520, 522, 174 N.W.2d 241,
> 243 (1970).

---

[3] *Sache* states *void*, not *voidable*.
[4] Citation from the then Minn. Stat. § 518.64 is now Minn. Stat. § 518A.39, subd. 2(g).

"Express language of divestment is not the only way a trial court may exercise its power to divest itself of jurisdiction over maintenance issues. \*\*\* In essence, **by entering a judgment which is final against a party, the trial court divests itself of jurisdiction.** (citing *Berens v. Berens*, 443 N.W.2d 558, 563 (Minn. App. 1989), *pet. for review denied* (Minn. Sept. 27, 1989)." *Borgeson v. Borgeson*, 461 N.W.2d 402, 403 (Minn. App. 1990).

"[E]xpress language of divestment is not the only way a trial court may exercise its power to divest itself of jurisdiction over maintenance issues. \*\*\* In essence, **by entering a judgment which is *final* against a party, the trial court divests itself of jurisdiction.**" *Berens v. Berens*, 443 N.W.2d 558, 563 (Minn. App. 1989), *pet. for rev. denied* (Minn. Sept. 27, 1989).

"[T]here is no time limit for commencing proceedings to set aside a judgment **void for lack of jurisdiction over the subject matter** or over the parties. . . . A void judgment is **legally ineffective; it may be vacated** by the court which rendered it at any time. **A void judgment cannot gain validity by the passage of time.**" (citations omitted). *Peterson v. Eishen*, 512 N.W.2d 338, 341 (Minn. 1994).

"**If a judgment is void, it must be set aside. It has no force and effect.**" *Lange v. Johnson*, 295 Minn. 320, 323, 204 N.W.2d 205, 208 (1973).

"Because **a judgment entered by a court without subject matter jurisdiction is void ab initio,** *see Lange v. Johnson*, 295 Minn. 320, 323, 204 N.W.2d 205, 208 (1973), a higher court cannot 'reverse' it, in the strictest sense of that word. However, 'reverse' plainly can be read to encompass the act of vacating a judgment, because a vacated judgment has the same practical effect as reversal. (citations omitted)." *Kulinski v. Medtronic Bio-Medicus, Inc.*, 577 N.W.2d 499, 502 (Minn. 1998).

145.    Being void ab initio, the 2018 Amended Subsequent QDRO never legally existed, could not be enforced or appealed, or considered by the Plan Administrator as a QDRO under 29 U.S.C. § 1056(d)(3) of ERISA.

146.    Because in the 2001 QDRO, Defendant Huntsman waived all her rights in and to Plaintiff's 3M ERIP pension benefits as of and after April 2, 1999, her waiver of those rights is irrevocable:

"Where a party intentionally relinquishes a known right by waiver, he cannot, without consent of his adversary, reclaim it. [citations omitted]. **A waiver, once established, is irrevocable ….**" *Engstrom v. Farmers & Bankers Life Ins. Co.*, 230 Minn. 308, 312, 41 N.W.2d 422, 424 (1950).

147.    Moreover, because the 2001 QDRO is incorporated into the Judgment and Decree, and because thereby Defendant Huntsman's said waiver in the 2001 QDRO is incorporated into the Judgment and Decree, the state court terminated its jurisdiction over future motions to modify the 2001 QDRO, including Defendant Huntsman's motions to modify the 2001 QDRO:

> "**We hold that in incorporating [wife's] waiver in the decree, the trial court terminated its jurisdiction over [wife's] future motions to modify,** and that no express language of divestment was necessary." *Berens v. Berens*, 443 N.W.2d 558, 563 (Minn. App. 1989), *pet. for rev. denied* (Minn. Sept. 27, 1989).

> "**After a district court issues a final judgment and decree that divests the district court of jurisdiction over the issue of … , that issue is not subject to modification** merely because the parties subsequently enter into another agreement that seeks to modify the original maintenance award. … [T]he supreme court has stated that parties may not confer jurisdiction upon a district court by stipulation or agreement. (citations omitted)." *Gossman v. Gossman*, 847 N.W.2d 718, 724 (Minn. App. 2014).

148.    Plaintiff emphasizes that Defendant Huntsman did not waive her rights to her 50% share of Plaintiff's 3M ERIP pension benefits **as of** April 2, 1999, but rather waived all her rights in and to **all of Plaintiff's 3M ERIP pension benefits he earned as of and after** April 2, 1999, which are the benefits Plaintiff began receiving as of June 1, 2007, so that her waiver is valid:

> "Second, in straightforward, express terms, **the dissolution judgment terminated 'all property rights** and claims which [former spouses] may have or hereafter have, as husband, wife, widower, widow, or otherwise, by reason of the marital relationship, *** **in or to or against the property of**

47

the other or his or her estate \*\*\* now owned \*\*\* by such other party.'"
*Robson v. Electrical Contractors Association Pension Trust*, 312 Ill. App.3d
374, 382, 727 N.E.2d 692, 698-99 (Ill. App. 2000).

**"In construing the terms of the waiver provision, ... we find that they
constitute a specific termination of [ex-wife's] rights and claims,
survivorship or otherwise, in the remaining one-half portion of [ex-
husband's] pension trust."** *Id.* at 312 Ill. App.3d 383, 727 N.E.2d 699.

**"When a proper waiver of interest by a spouse in a plan is incorporated
by a state court into a judgment, it will be enforced.** *See, e.g., Fox Valley
& Vicinity Constr. Workers Pension Fund v. Brown*, 897 F.2d 275, 279 (7th
Cir. 1990). ... **As part of their marital dissolution property settlement,
each waived all claims to any pension plans of the other.** ... The court
ruled that the waiver nullified the wife's status as designated beneficiary."
*In re the Estate of Gardner*, 103 Wn. App. 557, 562, 13 P.3d 655, 658 (2000).

**"[Former wife's] waiver of rights to the pension was valid."** *Id.* at 103
Wn. App. 563, 13 P.3d 659.

149.     Defendant Huntsman's waiver of her interests and rights in Plaintiff's 3M

ERIP pension benefits and rights in the 2001 QDRO is effective:

"[Ex-spouse] specifically waived, in her marital settlement agreement, any
interest she had in her husband's pension plans. **Because we hold that her
waiver is effective, we affirm the district court's order awarding the
pension benefits to [husband/plan participant's] estate."** *Estate of
Altobelli v. IBM*, 77 F.3d 78, 82 (4th Cir. 1996).

150.     Accordingly, the state court lacked jurisdiction to issue the 2010 QDRO,

2013 Subsequent QDRO, 2014 Amended Supplemental QDRO, 2015 Amended

Subsequent QDRO, and 2018 Amended Subsequent QDRO, and to issue any judgments

or orders deriving therefrom, and said QDROs should be set aside and vacated as null and

void QDROs.  Plaintiff is damaged by $213,145.90, and continuing from January 1, 2019

at $3,000.00 per month, plus accrued interest of $29,784.91, from Defendants Huntsman,

Eggen, and Eggen Law Office, jointly and severally, in consequence of payments said

Defendants received pursuant to the null and void 2010 QDRO, 2013 Subsequent QDRO, 2014 Amended Supplemental QDRO, 2015 Amended Subsequent QDRO, and 2018 Amended Subsequent QDRO.

151.    Wherefore, the 2018 Amended Subsequent QDRO being null and void, and also violating the 2001 QDRO, the Plan Administrator erred in making its Final Determinations that the 2018 Amended Subsequent QDRO is a valid QDRO under 29 U.S.C. § 1056(d)(3) of ERISA so that the Plan Administrator's Final Determinations must be set aside and vacated.

## COUNT III: Breach of Contract by Defendant Huntsman

152.    Plaintiff restates and realleges the allegations and claims in Paragraphs 1 through 151 and are hereby incorporated as if fully set forth herein.

153.    Plaintiff's and Defendant Huntsman's agreement in the Judgment and Decree that Plaintiff's 3M ERIP pension benefits would be divided by the 2001 QDRO, and the terms of the 2001 QDRO's 3M ERIP pension property division constitute a binding contract between Plaintiff and Defendant Huntsman:

> "Absent a statutory basis to reopen a dissolution judgment after the time for appeal has expired, **the district court may not modify a division of property**. *Mikkelsen v. Mikkelsen*, 286 Minn. 520, 522, 174 N.W.2d 241, 243 (1970). **Likewise, a stipulated division of property incorporated in a judgment is subject to the laws of contract,** *Shirk v. Shirk*, 561 N.W.2d 519, 521 (Minn. 1997), **and must be construed according to its plain meaning when its text is unambiguous.** *Starr v. Starr*, 312 Minn. 561, 562-63, 251 N.W.2d 341, 342 (1977)." *Harju v. Seymour (In re Seymour)*, A08-0698, (Minn. App. April 14, 2009), 2009 Minn. App. Unpub. LEXIS 338, *6. (bold added).

154.     By her receipt and use of the $213,145.90 deductions from Plaintiff's 3M ERIP pension payments pursuant to the 2010 QDRO, 2013 Subsequent QDRO, 2014 Amended Supplemental QDRO, 2015 Amended Subsequent QDRO, and 2018 Amended Subsequent QDRO, Defendant Huntsman in in breach of her contract for the 3M ERIP pension property division in the 2001 QDRO that Defendant Huntsman "shall have no rights in or to the portion of the Participant's accrued benefit under the Plan not assigned by this Order, or to any benefits earned by the Participant after the Date of Division.", thereby causing Plaintiff damages of $213,145.90 through January 1, 2019, and continuing from January 1, 2019 at $3,000.00 per month, plus accrued interest of $29,784.91 as of January 1, 2019.

155.     Plaintiff has a right to recover his damages of $213,145.90, and continuing from January 1, 2019 at $3,000.00 per month, plus accrued interest of $29,784.91, as of January 1, 2019, from Defendants Huntsman, Eggen, and Eggen Law Office, jointly and severally. *Henry v. Albert*, 268 Minn. 316, 320, 129 N.W.2d 317, 320 (1964) ("The right of [a] plaintiff to recover the money paid pursuant to [a] void judgment is a right to have restored to him that which was obtained by improper use of judicial process."); *Fontaine v. Guth*, 402 F.3d 1083, 1084 (11th Cir. 2005); *Fontaine v. Guth*, No. 3:02-CV-067-JTC, 2009 U.S. Dist. LEXIS 140057, *9-*10 (N.D. Ga. 2009).

### COUNT IV: Breach of Duties by Defendant 3M

156.     Plaintiff restates and realleges the allegations and claims in Paragraphs 1 through 155 and are hereby incorporated as if fully set forth herein.

157.     Defendant 3M has breached its duties and obligations under the 2001 QDRO

by distributing or providing to Defendant Huntsman portions of Plaintiff's monthly 3M ERIP pension payments in excess of those payments Defendant Huntsman is entitled pursuant to the 2001 QDRO.

158.    Plaintiff has been damaged by Defendant 3M's breach of its duties to enforce the 2001 QDRO and its breach of its duty and obligation under 29 U.S.C. § 1056(d)(3)(H)(i) to escrow all of the $3,000.00 per month that Defendant 3M has deducted monthly from Plaintiff's monthly 3M ERIP pension payments from August 1, 2018 through January 1, 2019, and continuing thereafter, such damages being $2,000.00 per month paid to Defendant Huntsman, amounting to $12,000.00 as of January 1, 2019, and continuing at $2,000.00 per month after January 1, 2019, plus pre-judgment interest thereon.    Wherefore, Plaintiff claims damages of said $12,000.00, and continuing at $2,000.00 per month after January 1, 2019, plus pre-judgment interest thereon, from Defendants Huntsman and 3M, jointly and severally.

### COUNT V: Payments in Equity to Defendant Huntsman From Plaintiff's 3M ERIP Pension Payments Are Not Permitted

159.    Plaintiff restates and realleges the allegations and claims in Paragraphs 1-158 and are hereby incorporated as if fully set forth herein.

160.    In its May 16, 2018 Order and Judgment, pp.14-15, Conclusions of Law 21, 22, upon which the 2018 Amended Subsequent QDRO is predicated, the state court ruled that deductions from Plaintiff's monthly 3M ERIP pension payments and paid to Defendant Huntsman are proper as payments in equity via a QDRO, which Plaintiff challenged in Plaintiff's Appeal, Exhibit 32, pages 15-19 therein, but the Plan Administrator declined to

address that equity issue, deferring that issue to this Court (see Exhibit 37, page 6 therein).

However, the U.S. Supreme Court has ruled that awards in equity are not provided for and

not permissible under ERISA:

> **"Nor do we think it appropriate to approve any generalized equitable exception -- ...-- to ERISA's prohibition on the assignment or alienation of pension benefits.** Section 206(d) reflects a considered congressional policy choice, a decision to safeguard a stream of income for pensioners (and their dependents, who may be, and perhaps usually are, blameless), **even if that decision prevents others from securing relief for the wrongs done them. If exceptions to this policy are to be made, it is for Congress to undertake that task."** *Guidry v. Sheet Metal Workers' Nat'l Pension Fund*, 493 U.S. 365, 376 (1990).

> "The impracticability of defining such a standard [**for equitable exceptions**] reinforces our conclusion that the **identification of any exception should be left to Congress.**" *Id.* at 377.

161.    Moreover, under the 2001 QDRO, Defendant Huntsman shall have "no

rights" in or to Plaintiff's awarded 3M ERIP pension benefits, which by plain language,

includes no rights in equity.   Wherefore, Defendant Huntsman is not entitled to any

payments pursuant to the 2010 QDRO, 2013 Subsequent QDRO, 2014 Amended

Supplemental QDRO, 2015 Amended Subsequent QDRO, or 2018 Amended Subsequent

QDRO in equity from Plaintiff's 3M ERIP pension payments.

## COUNT VI: Payment of Defendant Huntsman's Attorney Fee Judgments from Plaintiff's 3M ERIP Pension Payments Is Not Permitted

162.    Plaintiff restates and realleges the allegations and claims in Paragraphs 1-161

and are hereby incorporated as if fully set forth herein.

163.    29 U.S.C. § 1056(d)(3)(B)(ii)(I) of ERISA clearly **does not expressly**

**include attorney fees** in its list of provisions excepted from alienation so that payment of

Defendant Huntsman's attorney fees as ordered by the 2018 Amended Subsequent QDRO

is pre-empted by ERISA's anti-alienation protection:

> "ERISA § 514, 29 U.S.C. § 1144(a), provides, in pertinent part, that the provisions of ERISA governing employee benefit plans 'shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan' governed by ERISA. 29 U.S.C. § 1144(a). ERISA defines 'State law' as including 'all laws, **decisions**, rules, regulations, or other State action **having the effect of law**.' 29 U.S.C. § 1144(c)(1). **Accordingly, the Orders for Attorneys' Fees are 'State law' as that term is used in the ERISA preemption clause.**" *AT & T Management Pension Plan v. Tucker*, 902 F.Supp. 1168, 1176 (C.D. Cal. 1995).

> "The Supreme Court has **strictly construed** this anti-alienation provision, stating that **any exceptions to it must be expressly mandated by Congress**. *Guidry v. Sheet Metal Workers National Pension Fund*, 493 U.S. 365, 376, 107 L. Ed. 2d 782, 110 S. Ct. 680 (1990)." *Id.*

> "**Only 'qualified'** domestic relations orders are exempt from ERISA's spendthrift provisions; **other domestic relations orders are expressly made subject to the anti-assignment provision and are, as a result, preempted.'** (citation omitted). **It is undisputed that the Orders for Attorneys' Fees are not QDROs. Accordingly, the Orders of Attorneys' Fees violate ERISA's anti-alienation clause, and are therefore, preempted.** Likewise, compliance with the Orders for Attorneys' Fees or the enforcement of such compliance, would violate Title I of ERISA." *Id.*

> "**Mindful that exceptions to ERISA's antialienation provisions are strictly construed, we find the QDRO exception to ERISA's antialienation provision is not applicable; the divorce judgment, the February 24, 1997 order, and the January 26, 1998 order [ordering attorney fees paid through a QDRO] did not meet ERISA's requirements of a QDRO**. 29 U.S.C.A. § 1056(d)(3)(A)-(D).

> ***

> Third, requiring the party's attorneys' fees to be paid from John Johnson's pension and annuity fund **is a benefit not provided for under the Annuity Fund Plan and thus violates 29 U.S.C.A. § 1056(d)(3)(D)(i).**" *Johnson v. Johnson*, 320 N.J. Super. 371, 382, 727 A.2d 473, 479 (App. Div. 1999).

164.    The 2018 Amended Subsequent QDRO's provisions to pay Defendant Huntsman's attorney fees from the Plaintiff's 3M ERIP pension payments are not excepted from preemption by 29 U.S.C. § 1056(d)(1) because payments of attorney fees are not **expressly** listed as a provision in "**the provision of** child support, alimony payments, or marital property rights" in 29 U.S.C. § 1056(d)(3)(B)(ii)(I).  The U.S. Supreme Court has ruled against reading **implied** exceptions into a list of **express** exceptions:

> "[W]here Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of a contrary legislative intent." *Andrus v. Glover Const. Co.*, 446 U.S. 608, 616-17 (1980) (citing *Continental Casualty Co. v. United States*, 314 U.S. 527, 533 (1942)).

165.    The Supreme Court's interpretation in paragraph 164 is the statutory construction principle *expressio unius est exclusio alterius* (the inclusion of one is the exclusion of others), which is also a principle of Minnesota statutory construction:

> "It is a principle of statutory construction that **the expression of one thing means the exclusion of others** ('expressio unius est exclusio alterius')." *Underwood Grain Co. v. Harthun*, 563 N.W.2d 278, 281 (Minn. App. 1997).

166.    The U.S. Supreme Court has already determined that where a statute's categories for compensation **do not expressly include attorney services for compensation with particularity in the statute, attorney services are excluded from compensation claims under that statute:**

> "In its first part, the statute authorizes an award of compensation **to one of three types of persons: trustees, examiners, and § 327 professional persons.  A debtor's attorney not engaged as provided by § 327 is simply not included within the class of persons eligible for compensation. *** Unless the applicant for compensation is in one of the named classes of persons in the first part, the kind of service**

rendered is irrelevant." *Lamie v. United States Tr.*, 540 U.S. 526, 534 (2004).

"His interpretation of the Act--reading the word 'attorney' in § 330(a)(1)(A) to refer to 'debtors' attorneys' in § 330(a)(1) --would have us read an absent word into the statute. That is, **his argument would result 'not [in] a construction of [the] statute, but, in effect, an enlargement of it by the court, so that what was omitted, presumably by inadvertence, may be included within its scope.' *** With a plain, nonabsurd meaning in view, we need not proceed in this way.  *** Adhering to conventional doctrines of statutory interpretation, we hold that § 330(a)(1) does not authorize compensation awards to debtors' attorneys from estate funds,'** (citations omitted)." *Id.* at 538.

167.    Under the 2001 QDRO, Defendant Huntsman shall have "no rights" in or to Plaintiff's awarded 3M pension benefits, which by plain language, includes no rights to payment of her attorney fees from Plaintiff's awarded 3M ERIP pension payments. Wherefore, Defendant Huntsman is not entitled to any payments pursuant to the 2010 QDRO, 2013 Subsequent QDRO, 2014 Amended Supplemental QDRO, 2015 Amended Subsequent QDRO, or 2018 Amended Subsequent QDRO of her attorney fees from Plaintiff's 3M ERIP pension payments.

168.    Wherefore, payment of Defendant Huntsman's attorney fees from the Plaintiff's 3M ERIP pension payments as ordered by the 2018 Amended Subsequent QDRO is not permitted under 29 U.S.C. § 1056(d)(3) of ERISA or under the 2001 QDRO.

### COUNT VII: The 2018 Amended Subsequent QDRO Violates Maximum Withholding or Garnishment Laws

169.    Plaintiff restates and realleges the allegations and claims in Paragraphs 1 through 168 and are hereby incorporated as if fully set forth herein.

170.    Minn. Stat., § 518A.53, subd. 9(a), provides, in relevant part:

"*** Amounts **withheld** from an employee's income **must not exceed** the maximum permitted under the Consumer Credit Protection Act, **title 15 of the United States Code, section 1673(b)**."

171.    15 U.S.C. § 1673(b)(2)(A) states, in relevant part:

"**The maximum part of the aggregate disposable earnings** of an individual for any workweek which is subject to garnishment to enforce any order for the support of any person **shall not exceed—**

(A) where such individual is supporting his spouse or dependent child (other than a spouse or child with respect to whose support such order is used), **50 per centum of such individual's disposable earnings for that week**; and ***."

172.    The Minnesota Court of Appeals has ruled that the statutory paycheck withholding limits on Plaintiff's income are strictly construed:

"We do state for the record that 'a paycheck is a paycheck is a paycheck,' .... **The legislative mandates regarding the limits** on how much of a worker's wages can be attached **are strict and should be adhered to**." *Huntsman v. Huntsman*, A04-286, 2004 Minn. App. LEXIS 1344, *28 (Minn. App., Nov. 30, 2004)

173.    Plaintiff's aggregate disposable monthly income/earnings from his payments from both his 3M ERIP pension payments and Social Security is approximately $4,730.60 (see paragraph 53).  Under 15 U.S.C. § 1673(b)(2)(A), the maximum allowable monthly withholding/garnishment under 15 U.S.C. § 1672(a), (c) of Plaintiff's aggregate disposable earnings is 50%, which is **$2,365.30** (= 0.50 x $4,730.60).

174.    The 2018 Amended Subsequent QDRO withholds or garnishes $3,000.00 of Plaintiff's gross monthly 3M ERIP pension payments, thereby exceeding the maximum allowable withholding/garnishment of $2,365.30 from Plaintiff's gross $3,259.09 monthly

3M ERIP pension payments, which violates 15 U.S.C. § 1673(b)(2)(A) and thereby violates Minn. Stat., § 518A.53, subd. 9(a). Therefore, 15 U.S.C. § 1673(c) prohibits ab initio the state court from making and enforcing the 2018 Amended Subsequent QDRO such that the 2018 Amended Subsequent QDRO is not a valid DRO under Minnesota domestic relations law, or a valid DRO under 29 U.S.C. § 1056(d)(3) of ERISA, and the Plan Administrator's Final Determinations are therefore erroneous and void, and must be set aside and vacated.

175.    15 U.S.C. § 1677(1) allows the maximum amount allowed to be withheld/garnished to be more limited under applicable state law than under 15 U.S.C. § 1673(b). Under Minn. Stat., § 571.922(a)(1), withholding/garnishment of Plaintiff's aggregate disposable earnings may not exceed 25% of $4,730.60, which is **$1,182.65** (= 0.25 x $4,730.60) per month. Therefore, the 2018 Amended Subsequent QDRO's withholding/garnishment of $3,000.00 per month overwhelmingly exceeds $1,182.65 per month, thereby violating 15 U.S.C. § 1677(1) and Minn. Stat., § 571.922(a)(1), such that the 2018 Amended Subsequent QDRO is void ab initio also under Minn. Stat., § 571.922(c) and *Sache*, *supra* (Minn. Stat., § 571.922(c) is equivalent to 15 U.S.C. § 1673(c)), and the Plan Administrator's Final Determinations are erroneous and void, and must be set aside and vacated.

176.    Wherefore, the 2018 Amended Subsequent QDRO is null and void ab initio because it exceeds the maximum amount of withholding/garnishment allowed under Minn. Stat., § 518A.53, subd. 9(a), 15 U.S.C. § 1673(b)(2)(A), Minn. Stat., § 518A.53, subd. 9(a), 15 U.S.C. § 1677(1), and Minn. Stat., § 571.922(a)(1).

## COUNT VIII: The Plan Administrator's Final Determinations That the 2018 Amended Subsequent QDRO Is a Valid QDRO Under ERISA Are Erroneous

177.     Plaintiff restates and realleges the allegations and claims in Paragraphs 1 through 176 and are hereby incorporated as if fully set forth herein.

178.     Because the Plan Administrator's Final Determinations whether the 2018 Amended Subsequent QDRO is a valid QDRO under 29 U.S.C. § 1056(d)(3) of ERISA constitute a question of law, the Plan Administrator's Final Determinations are reviewed by this Court *de novo*.

179.     A lack or absence of jurisdiction may be raised at any point in litigation.

180.     Plaintiff had a due-process right under Minn. R. Civ. P. 52.02 to seek to amend the findings of fact and conclusions of law in the 2018 Amended Subsequent QDRO that are adverse to his 3M ERIP pension property benefits interests therein, and had moved to amend some findings of fact and conclusions of law in his *Petitioner's Motion to Amend the June 20, 2018 Amended Subsequent QDRO, or, Alternatively, Vacate It*, July 20, 2018. Thus, until *Petitioner's Motion to Amend the June 20, 2018 Amended Subsequent QDRO, or, Alternatively, Vacate It* had completed its procedural course, **the 2018 Amended Subsequent QDRO was subject to amendment and was not a valid, final DRO made pursuant to Minnesota domestic relations law**, which law includes due-process rights to amend the 2018 Amended Subsequent QDRO under Minn. R. Civ. P. 52.02. Therefore, the 2018 Amended Subsequent QDRO was not validly eligible as a valid final DRO under 29 U.S.C. § 1056(d)(3)(B)(ii)(II) when the Plan Administrator issued its July 20, 2018 Initial Determination (Exhibit 26). Wherefore, the Plan Administrator's July 20, 2018

Initial Determination and Final Determinations were premature and without jurisdiction, and should be set aside and vacated.

181.    Because the 2018 Amended Subsequent QDRO is null and void as stated in Counts II and VII, the 2018 Amended Subsequent QDRO is not a valid DRO under Minnesota domestic relations law; is not a valid DRO under 29 U.S.C. § 1056(d)(3)(B)(ii)(II); and therefore is not a valid QDRO under 29 U.S.C. § 1056(d)(3) of ERISA, and the Plan Administrator lacked jurisdiction to make its July 20, 2018 Initial Determination and its Final Determinations that the 2018 Amended Subsequent QDRO is a valid QDRO under 29 U.S.C. § 1056(d)(3) of ERISA.

182.    For a DRO to qualify as a QDRO under 29 U.S.C. § 1056(d)(3)(B)(i), the DRO must comply with 29 U.S.C. § 1056(d)(3)(B)(ii)(I), which requires that the DRO "relates to the provision of child support, alimony payments, or **marital** property rights to a spouse ...." Because Plaintiff's current 3M ERIP pension benefits of $3,259.09 gross per month include Plaintiff's marital and nonmarital 3M ERIP pension property benefits, the 2018 Amended Subsequent QDRO's taking of $3,000.00 per month from Plaintiff's current 3M ERIP pension benefits clearly relates beyond Defendant Huntsman's **marital** property rights in Plaintiff's current 3M ERIP pension benefits by unlawfully taking Plaintiff's current 3M ERIP **nonmarital** pension benefits, in effect taking more than a pound of Plaintiff's financial flesh. The 2018 Amended Subsequent QDRO fails to quantitatively distinguish between Plaintiff's current 3M ERIP **marital** and **nonmarital** pension benefits.

183.    Assuming arguendo that Plaintiff's **marital** property rights and benefits in Plaintiff's current 3M ERIP pension benefits are excepted from the anti-alienation or anti-assignment provisions under 29 U.S.C. § 1056(d)(3)(A), Plaintiff's **nonmarital** property rights and benefits in Plaintiff's current 3M ERIP pension benefits are **not** excepted from the anti-alienation or anti-assignment provisions under 29 U.S.C. § 1056(d)(1), 29 U.S.C. § 1056(d)(3)(A), and 29 U.S.C. § 1056(d)(3)(B)(ii)(I).

184.    Allowing the 2018 Amended Subsequent QDRO to include Plaintiff's current 3M ERIP **nonmarital** pension benefits is equivalent to having 29 U.S.C. § 1056(d)(3)(B)(ii)(I) read that the DRO "relates to the provision of child support, alimony payments, or **marital or nonmarital** property rights to a spouse ….", which is an unlawful and impermissible judicial enlargement of 29 U.S.C. § 1056(d)(3)(B)(ii)(I). *See Lamie v. United States Tr.*, 540 U.S. 538, *supra*.

185.    Wherefore, the Plan Administrator's Final Determinations that the 2018 Amended Subsequent QDRO is a valid QDRO under 29 U.S.C. § 1056(d)(3) of ERISA are erroneous so that its Final Determinations must be set aside and vacated.

### **COUNT IX: Estoppel**

186.    Plaintiff restates and realleges the allegations and claims in Paragraphs 1 through 180 and are hereby incorporated as if fully set forth herein.

187.    Defendant 3M is not timely paying to Plaintiff those 3M ERIP pension payments he is entitled to under the 2001 QDRO, and Defendant 3M should be estopped from not timely paying to Plaintiff his full 3M ERIP pension payments in accordance with the 2001 QDRO.

## COUNT X: Claim for Costs and Disbursements

188.    Plaintiff restates and realleges the allegations and claims in Paragraphs 1 through 182 and are hereby incorporated as if fully set forth herein.

189.    Defendants' actions have forced Plaintiff to incur expenses for the purpose of exhausting the administrative remedies through the 3M ERIP and bringing this action. Plaintiff is therefore entitled to any and all of his reasonable expenses he incurred by this litigation, including, but not limited to, court costs, disbursements, and other expenses, pursuant to Minnesota and federal law.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the Court do the following:

1.    Declare that Defendant 3M violated 29 U.S.C. § 1056(d)(3)(H)(i) by not escrowing the full $3,000.00 per month deducted from Plaintiff's 3M pension payments as of August 1, 2018 and monthly thereafter.

2.    Order that (1) Defendant 3M shall immediately escrow all deductions it makes from Plaintiff's monthly 3M ERIP pension payments, and (2) Defendant 3M is enjoined from making any distributions or payments to Defendants Huntsman, Eggen, or Eggen Law Office from Plaintiff's ongoing monthly or escrowed 3M ERIP pension payments, pending the final determination whether the 2018 Amended Subsequent QDRO is a valid DRO under Minnesota domestic relations law and a valid QDRO under 29 U.S.C. § 1056(d)(3) of ERISA.

3.    Order that Defendant 3M shall immediately pay into Plaintiff's 3M ERIP pension benefit escrow account all distributions or payments Defendant 3M made from

Plaintiff's monthly 3M ERIP pension payments as of and after August 1, 2018 to Defendants Huntsman, Eggen, or Eggen Law Office, pursuant to the 2018 Amended Subsequent QDRO, that Defendant 3M should have escrowed as required by 29 U.S.C. § 1056(d)(3)(H)(i).

4.    Order that the 2010 QDRO, 2013 Subsequent QDRO, 2014 Amended Supplemental QDRO, 2015 Amended Subsequent QDRO, and 2018 Amended Subsequent QDRO are (1) declared null and void; (2) not valid DROs under Minnesota domestic relations law or under 29 U.S.C. § 1056(d)(3) of ERISA; (3) not valid QDROs under 29 U.S.C. § 1056(d)(3) of ERISA; and (4) are set aside and vacated, such that the 2001 QDRO is restored as valid in its entirety as a QDRO under ERISA and is the only valid and enforceable QDRO under ERISA between Plaintiff and Defendant Huntsman.

5.    Declare that the Plan Administrator's Final Determinations that the 2018 Amended Subsequent QDRO is a valid QDRO under 29 U.S.C. § 1056(d)(3) of ERISA are erroneous, and order them set aside and vacated.

6.    Pursuant to 28 U.S.C. § 2201(a), declare the rights, legal obligations, and relations of all parties to this action as relate to the 2001 QDRO and the enforceability or not of the 2001 QDRO, by and between the parties to this action, including Defendant 3M.

7.    Order Defendant 3M to timely pay to Plaintiff those 3M ERIP pension payments that Plaintiff was awarded by the 2001 QDRO.

8.    Order Defendants Huntsman, Eggen, and Eggen Law Office, jointly and severally, to immediately pay, disgorge, or reimburse, to Plaintiff, any and all all monies said Defendants have received from Plaintiff's 3M ERIP pension payments above and

beyond those payments Defendant Huntsman was entitled to receive under the 2001 QDRO, plus pre-judgment interest on said monies as allowed by Minnesota law, said monies amounting to $213,145.90, and continuing at $3,000.00 per month after January 1, 2019, with interest of $29,784.91 accrued through January 1, 2019, and continuing to accrue thereafter, subject to revision through the date of the Court's Order.

9.    Order entry of judgment in the amount of $213,145.90 as damages through January 1, 2019, and continuing at $3,000.00 per month after January 1, 2019, in Plaintiff's favor and against Defendants Huntsman, Eggen, and Eggen Law Office, jointly and severally.

10.    Order entry of judgment in the amount of $29,784.91 as pre-judgment interest on aforesaid $213,145.90 at 4.00% simple annual interest under Minnesota law through January 1, 2019, and continuing at 4.00% simple annual interest after January 1, 2019, in Plaintiff's favor and against Defendants Huntsman, Eggen, and Eggen Law Office, jointly and severally.

11.    Order that Defendant 3M shall immediately release to Plaintiff all of his 3M ERIP pension payments that Defendant 3M has escrowed as of August 1, 2018 and thereafter.

12.    Order Defendants Huntsman, Eggen, Eggen law Office, and 3M, jointly and severally, to immediately remit to Plaintiff all of his reasonable expenses Plaintiff incurred by this litigation, including but not limited to costs, disbursements, and reasonable attorney fees, including legal counseling, if incurred, pursuant to 29 U.S.C. § 1132(g).

13.    Award Plaintiff such other and further relief as the Court may deem just, fair, equitable, and proper to which he is entitled.

Date: January 2, 2019                    By: _James R. Huntsman_____

James R. Huntsman, Plaintiff, Pro Se
2570 Moundsview Drive
Mounds View, MN  55112-4110
Phone: (763) 784-2656
Email: Logicistan@comcast.net